[Cite as *State v. Jacinto*, 2020-Ohio-3722.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                              :

     Plaintiff-Appellee,                 :

                                   No. 108944

     v.                                  :

KAINOA JACINTO,                            :

     Defendant-Appellant.                :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** July 16, 2020

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-633255-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Sean M. Kilbane, Assistant Prosecuting Attorney, *for appellee.*

Patituce & Associates, L.L.C., Joseph C. Patituce and Megan M. Patituce, *for appellant.*

EILEEN A. GALLAGHER, J.:

{¶ 1} Defendant-appellant Kainoa Jacinto appeals his conviction for felonious assault following a jury trial. Jacinto contends that the trial court erred in

failing to give the jury a self-defense instruction, in admitting evidence of a 911 call from a caller who did not testify and in admitting "expert" opinion testimony from a paramedic that had not been disclosed in a written expert report and that exceeded the scope of his expertise. Jacinto further contends that his conviction is not supported by sufficient evidence and is against the manifest weight of the evidence and that his four-year prison sentence is not supported by the record. For the reasons that follow, we affirm the trial court's decision.

**Procedural History and Factual Background**

{¶ 2} On October 9, 2018, a Cuyahoga County Grand Jury indicted Jacinto on one count of felonious assault in violation of R.C. 2903.11(A)(1), a second-degree felony. The charge arose out of September 16, 2018 incident in which Jacinto punched and "knocked out" Bryant Lee ("Lee"), who struck his head on the concrete sidewalk as he fell to the ground. As a result of the incident, Lee sustained a serious brain injury. Jacinto pled not guilty and, on July 24, 2019, a jury trial commenced. A summary of the relevant evidence presented at trial follows.

{¶ 3} On September 15, 2018, Jacinto and Lee were in Cleveland, attending a conference for a company for which they both worked, ACN, Inc. ("ACN"), a "one-stop shop" for services such as gas and electric utility services, high speed internet, home security services and identity theft protection. Jacinto traveled to Cleveland from Michigan for the conference, and Lee and his wife, Jaime Lee ("Jaime"), traveled to Cleveland from Wisconsin for the conference. Jacinto and the Lees were staying at the Hilton Garden Inn on Carnegie Avenue in Cleveland.

{¶ 4} The Lees and Jacinto met for the first time that evening at the hotel bar. Around midnight, Jacinto, the Lees and several other ACN conference attendees decided to leave the hotel bar and go to other downtown bars. Along the way, they bumped into another ACN conference attendee, Orlando Contreras, who was also staying at the Hilton Garden Inn. Contreras had never met Jacinto or the Lees prior to the conference.

{¶ 5} Jaime described Jacinto as "obnoxious," "loud" and "cocky." She stated that he talked about being a mixed martial arts ("MMA") fighter, bragged about his houses, cars and how much money he had made and was "poking at everybody and kind of flaunting * * * the entire night." Jaime stated that she talked and laughed with the other ACN conference attendees and "played the role" because she knew her husband wanted to "climb the ladder of the team in this organization." She testified that Lee and Jacinto talked a lot and seemed to be getting along very well.

{¶ 6} Contreras testified that Jacinto carried himself as being "someone of importance" and that Jacinto told him that he was "a fighter" and that he "trained semi-pro MMA." Because Contreras also spent a lot of the time in the gym and had fought some men with professional training, the two men discussed their past experiences and training history. Jacinto told Contreras that he had been "known to beat several people up in a single incident if needed."

{¶ 7} Contreras testified that "everyone got along well" that night with "lots of laughs, jokes, situations" and that everyone was drinking heavily. At around 2:00 a.m., the group headed back to the hotel.

{¶ 8} Jaime testified that once they arrived back at the hotel, Jacinto made a "slick," "annoying" comment to her that made her "very angry." Jaime told Jacinto that she was "not one to mess with" and her husband suggested that she go to bed. Jamie took her husband's advice and went back to their hotel room.

{¶ 9} Contreras testified that as they were walking back to the hotel, Jacinto told Contreras he could have "hooked him up" with a girl at the bar but that his "dance moves" "f***** it up." Contreras said he did not react to Jacinto's comment, but that Lee intervened and told Jacinto he had been "rude" and "disrespectful" and owed Contreras an apology. Contreras stated that Lee was "trying to prove a point" to Jacinto, i.e., that "you can't be rude to people," but that Jacinto "wouldn't accept it" and said he had done nothing wrong. The two men went back and forth about the issue for several minutes.

{¶ 10} Contreras testified that, during this time, Jacinto told him he was "trying not to get mad" and was "antsy," "pacing back and forth," "[l]ike he had to like basically walk it off." After a bit, the situation deescalated. Jacinto and Lee shook hands and appeared to be "cool," and the three men began walking back toward the hotel.

{¶ 11} Before the three men went back into the hotel, however, the situation re-escalated. According to Contreras, "somebody said something and then it started

right back up again * * * just about the same thing." The two men got "real close to each other," "chest to chest," and Lee poked Jacinto in the chest "like three times," "saying something."

{¶ 12} Contreras testified that, by this time, all three men were "pretty intoxicated." In addition to whatever else the men had had to drink earlier that evening, Contreras stated that the men had gone to three or four bars, were "taking turns" buying rounds and all had had "one shot, one drink at each location, [with] probably an extra drink at the last location."

{¶ 13} After the "poking," the situation calmed down again for a bit. Contreras testified that after Lee poked Jacinto, Jacinto turned around and walked away, trying to "walk it off" as Lee kept talking, lecturing Jacinto about his disrespectful conduct.

{¶ 14} At some point during their interaction, Jaime came out of the hotel and told Lee it was "time to go to bed." Jaime testified that Lee had his hands in his pockets, that the three men laughed at her remark and that it "seemed like everything was fine." "[S]ens[ing] nothing being wrong," Jaime went back to her hotel room, took a shower and went to bed. Lee remained outside with Jacinto and Contreras. The next time Jaime saw Lee was in the intensive care unit at a nearby hospital.

{¶ 15} In the last four minutes of their interaction, the situation re-escalated once again. Jacinto was about to enter the hotel, but suddenly turned back. Contreras stated that, at this point, Lee said something "petty" to Jacinto and

Jacinto "just couldn't take it anymore," his eyes were locked on Lee, he was "clearly mad" and Contreras could tell he was "ready to fight," i.e., that he had "hit that switch" and was in "attack mode."

{¶ 16} Contreras testified that as Jacinto started moving towards Lee, he got in between the two men and, for approximately three or four minutes, held Jacinto back from Lee, stepping in front of Jacinto, blocking him and "pressing him away" from Lee, who was "standing still" but "kept talking." At the time, Lee and Jacinto were "like three to four feet [apart,] just outside striking distance."

{¶ 17} Contreras testified that, eventually, Lee said, "Let him go. I will fight him," and assumed a "fighting stance." Deciding there was "nothing more [he] could do about it" and that the two men were "clearly going to fight," Contreras dropped his hands, turned around and walked back towards the hotel entrance. At this time, Lee and Jacinto were approximately eight feet apart. Contreras stated that he was "trying not to see anything" and was "just trying to go to the door," but that he heard "a very brief fight," i.e., "scruffles." Four or five seconds later, Jacinto was "walking up right by [his] side" and they walked into the hotel together. Contreras testified that he felt "terrified" as he rode the elevator with Jacinto because he "did not want to be involved" and "did not want to get assaulted" himself.

{¶ 18} Contreras stated that although Lee may have "verbally initiated" the fight by "arguing" with Jacinto, "trying to make things right," Lee never pushed or punched Jacinto. According to Contreras, although it was an "emotional conversation" between Lee and Jacinto in which Lee "yelled" and "raised his voice,"

Lee never threated Jacinto and never said anything "derogatory" or used "fighting words"; he "just took it too far" trying to make a point. Contreras testified that the "fight" occurred approximately ten minutes after Lee "poked" Jacinto in the chest.

{¶ 19} Surveillance footage from the hotel's security cameras captured portions of the interaction between the three men until the last four or five minutes leading up to the "fight." The surveillance video has no audio but shows Jacinto with his hand on the door to the hotel lobby, opening the door at approximately 3:15:40.[1] He closes the door and turns back to shake hands with Contreras. Jacinto and Lee shake hands and Lee pulls Jacinto towards him in a hug at approximately 3:15:54. Jacinto then moves towards Lee, talking and gesturing with his right hand in close proximity to Lee. It cannot be seen from the video whether Jacinto makes contact with Lee when gesturing. As the two men continue talking, Lee moves toward Jacinto and gestures and points his index finger at Jacinto, ultimately touching or poking Jacinto in the chest with his fingers at 3:16:14. The two men continue talking. Jacinto backs away at first, then, once again, moves closer towards Lee, gesturing with his right hand as he talks. Then Lee moves towards Jacinto, pointing his finger and gesturing at Lee. Both men continue gesturing with their hands and talking in close proximity to one another.

---

[1] 3:15:40 and the numbers that follow refer to the elapsed time on the surveillance video, which starts at 3:00:00. It is unclear from the record whether that elapsed time directly correlated with time of day, i.e., whether the events depicted at 3:15:40 occurred precisely at 3:15:40 a.m.

{¶ 20} At approximately 3:16:53, Contreras steps in, places his hand on Jacinto's shoulder and proceeds to get in between the two men as they continue to talk or spar at one another, slowly walking around and then away from the hotel door. The men go off camera at approximately 3:18:10.

{¶ 21} At approximately 3:22:40, Lee's wife opens the hotel door and stands outside, holding the open door, apparently talking to the men, for approximately eight seconds, before going back into the hotel. At approximately 3:25:04, Jacinto opens the hotel door with Contreras following him, then closes the door and turns back toward Lee, who can be seen gesturing behind him. Jacinto walks toward Lee, saying something and gesturing at Lee while Contreras has his hand on the hotel door.

{¶ 22} At approximately 3:25:40, both Lee and Jacinto are off camera again. Contreras takes his hand off the door and walks off camera to the left at approximately 3:26:02. The three men remain off camera until approximately 3:30:42 when Jacinto opens the hotel door for Contreras and he and Jacinto walk back into the hotel. Lee is never seen on the hotel surveillance footage again.

{¶ 23} Toni Newborn, a 911 operator and paramedic for the city of Cleveland, testified that at approximately 3:41 a.m. on September 16, 2018, she received a 911 call from a male caller reporting that someone had punched a person at the Hilton Garden Inn and that the victim had fallen to the ground. The 911 call was played for the jury in its entirety. The male caller stated: "A guy walked up to him and hit him and knocked him out and his head hit the concrete, so he is knocked out, so I don't

know if he is breathing or what." The caller stated that he had been sitting in his car and heard the sound of the person's head hitting the ground from across the street "so he hit the ground hard." He indicated that the victim was "barely breathing" and "gasping for air" and had urinated all over himself. The caller further stated that he and a woman had tried to pick up the victim but that they could not do so because he was "knocked out." The caller indicated that after "the guy hit him and [the victim] hit the ground, the two other guys walked on back into the hotel." The 911 operator asked the caller whether the man had been assaulted, and he replied, "evidently, yeah." The caller did not identify or describe the perpetrator(s) but stated, in response to further inquiry by the 911 operator, that he could "point [the police] in their direction."

{¶ 24} Leah Sessoms, a night auditor at the Hilton Garden Inn, testified that she observed a white male (later identified as Jacinto) and an African-American male (later identified as Lee) on the sidewalk in front of the hotel "in what seemed to be a verbal altercation." She indicated that the two men would be arguing and then they would appear friendly, e.g., embracing each other in a friendly manner or smoking a cigarette together, and that it kept going "back and forth," escalating and deescalating and re-escalating again. She testified that she did not believe she needed to call police because there was a third male (later identified as Contreras) who "seemed to keep the guys apart when they were getting into each other's faces." Sessoms testified that she went outside for an unrelated reason and when she was returning to the hotel, she saw Lee laying on the ground. She stated that he had

urinated himself and was not moving at all. She called the police. When the police arrived, she told them what she had observed.

{¶ 25} Cleveland Police Officer Domenic Ragazzo was among the first to arrive at the scene. He testified that he received a call at approximately 3:45 a.m. that a "male [was] down" at the Hilton Garden Inn. Officer Ragazzo testified that when he and his partner arrived at the scene a few minutes later, he saw a black male, later identified as Lee, lying down on the ground outside the hotel, face up, unconscious with "what looked like vomit or spit coming out of his mouth." According to Officer Ragazzo, at first, he did not believe Lee had been assaulted because he saw no blood, bruising or injuries or "sign of any assault" to Lee's face and Lee's body was not in a position one would expect after a fist fight. Officer Ragazzo testified that upon arrival, Lee was "laying very stiff" with his arms down on the side and his feet "straight up." EMS arrived around the same time as Officer Ragazzo, and immediately began tending to Lee.

{¶ 26} Gregory Hyde, a paramedic with the city of Cleveland, was one of the EMS personnel who was dispatched to the scene in response to the 911 call. He had been a paramedic for 29 1/2 years and had been on several hundred calls involving head trauma. Hyde testified that when he arrived on scene at 3:51 a.m., he learned from a bystander that Lee had been punched in the mouth, that he had then fallen, striking his head on the sidewalk, and that Lee had not moved after falling to the ground. Hyde testified that when he first observed Lee, Lee was unconscious and was in a decorticate posture, i.e., his arms were in towards the body, his hands were

out, his legs were stiff and rigid, which was "indicative of a significant brain injury." Hyde also noted that Lee had vomit in his airways, a strong radial pulse and high blood pressure and that his respiratory rate was shallow and irregular — all of which was consistent with a serious head injury. Hyde also observed a small, "fresh" abrasion to Lee's mouth or upper lip. Hyde stated that he did not see any bruising but was not surprised, notwithstanding the information he had received that Lee had been punched, because bruising takes time from "several minutes up to several hours" to start showing. Hyde indicated that Lee's condition was "quickly deteriorating" and "very concerning," with all signs pointing to a significant brain injury.

{¶ 27} Hyde stated that Lee's injury was not consistent with someone stumbling over drunk and hitting his head against the ground because although people can sustain significant head injuries from stumbling while drunk, they do not typically fall backwards as Lee did here. He testified that, based on his training and experience, "it would take a significant amount of force," i.e., "[i]t would not be a light slap or just a push away * * * it would have to be a very hard purposefully thrown punch meant to cause damage," to "knock somebody out and over" and cause the type of injuries Lee sustained.

{¶ 28} Hyde further testified that, based on his experience and training, he would not expect to see such a significant injury from an individual being punched, knocked to the ground and then losing consciousness (i.e., losing consciousness only after hitting the ground) because if a person gets knocked to the ground, the body

has basic reflexes that will engage to protect itself from serious injury. Hyde stated that Lee's injuries were more consistent with someone being punched and knocked unconscious before hitting the ground because an individual's reflexes do not work when a person is unconscious. He stated that he believed Lee's "head trauma" was "[p]robably a combination of both" the punch and hitting the ground.

{¶ 29} When defense counsel asked Hyde, on cross-examination, what he thought had happened to Lee, Hyde stated that he believed Lee "took a blow that knocked him unconscious," that he then "fell straight backwards with nothing protecting him" and "smacked his head on the concrete," "[c]reating a very significant head injury." Hyde testified that his theory of what had occurred was an "assumption" based on his experience and training, what he had been told by bystanders and what he had personally observed regarding Lee's injuries, including the fresh abrasion on his face and Lee's condition at the scene,

{¶ 30} Dr. Laura Brown, a trauma surgeon at MetroHealth Medical Center, treated Lee following the incident. She testified that Lee had sustained a "rare" "brain bleed," i.e., a subdural hematoma to the right side of his brain caused by tearing of veins leading from the brain to the dura, and was admitted to the trauma intensive care unit in critical condition after having a hemicraniectomy, a procedure involving the removal of a piece of a patient's skull to relieve pressure caused by swelling of the brain. Dr. Brown testified that she did not have "a complete mechanism" as to how the tear developed in Lee's case. However, she noted that the hospital staff had been told that he had been hit or punched and that a CT scan

revealed bruising on the outside of the skull and a "significant amount" of "acute" swelling and bruising on the left side of the jaw, "meaning it happened as a result of some injury just prior." Dr. Brown testified that a "pretty significant amount of force" would have been necessary "to cause that amount of bruising." She testified that she did not observe any facial bruising on Lee but explained that bruising is caused by broken blood vessels underneath the tissue, so if the broken blood vessels are under the surface, "you may not see it right away"; "you will see it over time." She also noted that the mandible is one of the strongest bones in the body and that there is a lot of soft tissue around it so "it can hide it very easily."

{¶ 31} Dr. Brown testified that she could not say "medically" that "a single punch" caused Lee's brain injury because she did not know "if the mechanism of his injury was the punch and then a fall" but that she also could not say that "it didn't have anything to do with it." She stated that "it's very rare for a person of [Lee's] age to sustain a subdural from a fall" and that, in her view, the cause of Lee's injury was "both the punch and the fall * * * he didn't have a subdural before that happened." She explained:

> [A]ny injury, significant injury that shakes the brain can cause tearing of those veins. So if there was enough force from an impact to the left jaw, it could shake the brain inside the dura causing tearing of the vein. It can also happen from when the head hit the concrete. We wouldn't be able to differentiate between those two. I can't tell you for sure.
>
> Q. You are unable to say whether the tearing came from a punch or a fall?
>
> A. Correct.

{¶ 32} Lee was hospitalized for 59 days in Cleveland before being med-flighted back to Wisconsin, where he continued receiving treatment at a brain injury rehabilitation facility. Lee has significant memory issues, cannot walk, cannot talk above a whisper, has never been able to return to his home and has been declared incompetent.

{¶ 33} Cleveland Police Detective Aaron Reese was one of the detectives who investigated the case. He conducted three interviews of Jacinto — two over the telephone (recorded on his body camera) and one in-person interview (also recorded). Portions of all three interviews were played for the jury. In the first telephone interview, conducted on September 17, 2018 at approximately 4:30 p.m., Jacinto told Detective Reese that he had no recollection of getting into an altercation or fight with anyone that evening and that he only recalled going out, waking up in the hotel with his father the next morning and then going to the ACN conference. Jacinto denied telling anyone that he was an MMA fighter. He said that he had never been an MMA fighter and that he did not "even know how to fight."

{¶ 34} In a second telephone interview later that night, Jacinto told Detective Reese that he had been thinking about the incident "nonstop" and that his memory was "coming back." Jacinto told Detective Reese that he could not recall specifically what he and Lee were arguing about but that he was "in a situation where a few people were trying to tell me that I'm doing something bad and * * * I didn't understand it." Jacinto told Detective Reese that "[a]ll of us were being drunk idiots" and that Lee had been "getting in [his] face" and kept "tapping [Jacinto's] chest"

"over and over." Jacinto stated that he felt like he had been "egged on" and was "in [his] own corner." He told the detective that he hit Lee "in the head or in the jaw" once and "that's it," that Lee did not hit his head on anything "on the way down" and that Lee "went to sleep" after he hit him and was "unconscious and snoring when he hit the ground." When Detective Reese asked Jacinto whether Lee had punched or pushed him, Jacinto responded, "The only thing that happened was just me hurting [Lee] at the end with that one punch." When Detective Reese asked Jacinto whether it had "crossed [his] mind" to get help for Lee, Jacinto replied, "yes," but stated that he had been drinking and "tried to make like nothing had happened" because he "didn't want anything to do with it."

{¶ 35} In the third interview, an in-person interview at the Third District Detective Bureau conducted on September 30, 2018, Jacinto told Detective Reese that when they got back to the hotel, after everyone had been having a good time and drinking that evening, "things started going sideways." He stated that Contreras and Lee "started an argument" with him regarding a comment he had made about Contreras' dancing. Jacinto stated that Lee began "tapping" on his chest, telling Jacinto what he had "done wrong." Jacinto said that he did not know what he had done wrong and tried to apologize, but that "it didn't work out." Jacinto stated that he told Lee to stop touching him and tried to "swat" his hand away but that Lee kept "tapping" and "poking" his chest and getting "in [his] face." Jacinto indicated that eventually he had had enough. Jacinto stated that Contreras tried to stop him and told him that "it wasn't worth it," but that he put his vape down, took off his shirt

and gave Lee a "quick right jab" to the jaw. Jacinto told Detective Reese that after he hit Lee, Lee "let out a loud snore," fell backwards and "collapsed" on the ground "snoring." Jacinto said that he "didn't even really connect very hard" and that he did not realize he could cause "that kind of damage" and felt "horrible about it." Jacinto said that he had told people he was an MMA fighter — even though he was not — because he was "cocky" and "trying to be cool" and wanted people to like him. Jacinto acknowledged that he could have walked away from the situation, but that he chose not to.

{¶ 36} At the close of the state's case, Jacinto moved for acquittal pursuant to Crim.R. 29(A), arguing that there was insufficient evidence that Jacinto, by throwing a single punch, had knowingly caused Lee serious physical harm. The trial court denied the motion. Jacinto rested without presenting any witness testimony. He renewed his Crim.R. 29 motion and the trial court, once again, denied it.

{¶ 37} The trial court instructed the jury on felonious assault and the lesser-included offense of assault in violation of R.C. 2903.13(B). Jacinto also requested a jury instruction on self-defense. The trial court denied the request, concluding, based on the evidence presented, that no reasonable jury could find that Jacinto had acted in self-defense when he struck Lee.

{¶ 38} On July 31, 2019, the jury found Jacinto guilty of felonious assault. Jacinto was referred to the Cuyahoga County Probation Department for a presentence investigation report ("PSI"). After reviewing the PSI and sentencing memorandum, hearing from Lee's family, the state, Jacinto's family, Jacinto and

defense counsel and considering the purposes and principles of sentencing, the relevant sentencing factors and "other cases," the trial court sentenced Jacinto to four years in prison with three years of mandatory postrelease control.

{¶ 39} Jacinto appealed, raising the following six assignments of error for review:

> ASSIGNMENT OF ERROR 1: The trial court erred in failing to instruct the jury that the state of Ohio was required to prove, beyond a reasonable doubt, that appellant did not act in self-defense.
>
> ASSIGNMENT OF ERROR 2: The trial court abused its discretion in admitting a 911 call from an unidentified individual who was not subjected to cross-examination in violation of appellant's rights protected under the United States and Ohio Constitutions.
>
> ASSIGNMENT OF ERROR 3: The trial court erred in permitting EMT Hyde to provide expert testimony in violation of the Ohio Rules of Evidence, the Ohio Rules of Criminal Procedure, and appellant's constitutionally protected rights under the United States and Ohio Constitutions.
>
> ASSIGNMENT OF ERROR 4: Appellant's conviction was against the manifest weight of the evidence.
>
> ASSIGNMENT OF ERROR 5: The state failed to present sufficient evidence to prove each and every element of the offense beyond a reasonable doubt.
>
> ASSIGNMENT OF ERROR 6: The trial court erred in sentencing appellant to a four-year term of incarceration.

{¶ 40} For ease of discussion, we address Jacinto's assignments of error out of order where appropriate.

**Law and Analysis**

**Self-Defense Jury Instruction**

{¶ 41} In his first assignment of error, Jacinto argues that the trial court erred in denying his request for a self-defense jury instruction. He contends that sufficient evidence was presented at trial to submit the issue of whether he acted in self-defense to the jury.

{¶ 42} As a general matter, the trial court must "'fully and completely give all jury instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder.'" *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, 29 N.E.3d 939, ¶ 46, quoting *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus; *State v. Joy*, 74 Ohio St.3d 178, 181, 657 N.E.2d 503 (1995). Requested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case and if reasonable minds might reach the conclusion sought by the requested instruction. *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 240; *State v. Crawford*, 2016-Ohio-7779, 73 N.E.3d 1110, ¶ 14 (8th Dist.). In determining whether a jury instruction on an affirmative defense should be given, "'the court must view the evidence in a light most favorable to the defendant. The question of credibility is not to be considered.'" *State v. Sullivan*, 11th Dist. Lake Nos. 2019-L-143 and 2019-L-144, 2020-Ohio-1439, ¶ 45, quoting *State v. Belanger*, 190 Ohio App.3d 377, 2010-Ohio-5407, 941 N.E.2d 1265, ¶ 6 (3d Dist.). Appellate courts

review a trial court's refusal to give a requested jury instruction for abuse of discretion. *Adams* at ¶ 240.

{¶ 43} Under Ohio law, a person is permitted to act in self-defense. R.C. 2901.05(B)(1). Self-defense is an affirmative defense. In cases involving the use of nondeadly force[2] it applies where: (1) the defendant was not at fault in creating the situation giving rise to the affray in which the use of force occurred, (2) the defendant had reasonable grounds to believe and an honest belief, even if mistaken, that he or she was in imminent danger of bodily harm and (3) the only means to protect himself or herself from such danger was the use of force not likely to cause death or great bodily harm, i.e., the defendant did not use more force than was reasonably necessary to defend against the imminent danger of bodily harm. *See, e.g.*, *Ohio Jury Instructions* CR Section 421.19 (Rev. April 13, 2019); *State v. Kilbane*, 8th Dist. Cuyahoga No. 106753, 2019-Ohio-863, ¶ 13*; State v. Hunt*, 8th Dist. Cuyahoga No. 94534, 2011-Ohio-92, ¶ 20; *Cleveland v. Welms*, 169 Ohio App.3d 600, 2006-Ohio-6441, 863 N.E.2d 1125, ¶ 19 (8th Dist.); *State v. Chavez*, 3d Dist. Seneca Case Nos. 13-19-05, 13-19-06 and 13-19-07, 2020-Ohio-426, ¶ 40; *see also State v. Palmer,* 10th Dist. Franklin No. 2013-Ohio-5970, ¶ 13 ("A defendant * * * cannot establish self-defense using non-deadly force if he or she uses force

---

[2] There is no dispute in this case that the force used by Jacinto was nondeadly force. *See, e.g., State v. Triplett*, 192 Ohio App.3d 600, 2011-Ohio-816, 949 N.E.2d 1058, ¶ 14 (8th Dist.) (one punch is not "comparable to deadly force"); *State v. Redding*, 3d Dist Union No. 14-19-01, 2019-Ohio-5302, ¶ 19 ("'A single punch, standing alone, may not constitute deadly force.'"), quoting *State v. Jeffers*, 11th Dist. Lake No. 2007-L-011, 2008-Ohio-1894, ¶ 81; *State v. Davis*, 10th Dist. Franklin No. 17AP-438, 2018-Ohio-58, ¶ 25 ("A single punch with a fist is ordinarily considered use of non-deadly force.").

greater than that reasonably necessary to defend against the imminent use of unlawful force."). There is no duty to retreat to avoid the danger in cases involving the use of nondeadly force, even if retreat is possible. *Welms* at ¶ 19; *Chavez* at ¶ 40.

{¶ 44} Under former R.C. 2901.05(A), the defendant had the burden of proving self-defense by a preponderance of the evidence. Former R.C. 2901.05(A) stated:

> Every person accused of an offense is presumed innocent until proven guilty beyond a reasonable doubt, and the burden of proof for all elements of the offense is upon the prosecution. The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense, is upon the accused.

{¶ 45} Effective March 28, 2019, Ohio's self-defense law was changed to require the state to prove that a defendant did not act in self-defense where the defense could reasonably be found apply. [3] R.C. 2901.05(A), as amended, states, in relevant part:

> Every person accused of an offense is presumed innocent until proven guilty beyond a reasonable doubt, and the burden of proof for all elements of the offense is upon the prosecution. The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense *other than self-defense* * * * as described in division (B)(1) of this section, is upon the accused.)

(Emphasis added.) R.C. 2901.05(B)(1) further states:

> A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of

---

[3] In this case, although the incident occurred prior to the effective date of the amended statute, the trial occurred after the effective date. The parties agree that the amended version of the statute applies.

an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

{¶ 46} Thus, if evidence is presented at trial that tends to support that a defendant used nondeadly force in self-defense, the state must now prove beyond a reasonable doubt that the defendant did not use that force in self-defense. In other words, the state must disprove at least one of the elements of the use of nondeadly force in self-defense beyond a reasonable doubt, i.e., the state must prove that (1) the defendant was at fault in creating the situation giving rise to the affray in which the force was used or (2) the defendant did not have reasonable grounds to believe or an honest belief that he or she was in imminent danger of bodily harm or (3) the defendant used more force than was reasonably necessary to defend against the imminent danger of bodily harm. *See, e.g., State v. Carney*, 10th Dist. Franklin No. 19AP-402, 2020-Ohio-2691, ¶ 31; *State v. Nestingen*, 5th Dist. Richland No. 2019 CA 110, 2020-Ohio-2965, ¶ 17.

{¶ 47} The state has no obligation to disprove all possible affirmative defenses a defendant may claim applies. The state need not disprove an affirmative defense unless evidence is presented that is sufficient to raise that defense. "A bare assertion by the defendant that he acted in self-defense will not bring the affirmative defense of self-defense into issue in the trial." *State v. Gideons*, 52 Ohio App.2d 70, 73, 368 N.E.2d 67 (8th Dist.1977). "Coupled with such an assertion must be

supporting evidence from whatever source introduced of a nature and quality sufficient to raise the defense and which '* * * if believed, would under the legal tests applied to a claim of self-defense permit a reasonable doubt as to guilt * * *.'" *Gideons* at 73, quoting *State v. Robinson*, 47 Ohio St.2d 103, 113, 351 N.E.2d 88 (1976).

{¶ 48} *Black's Law Dictionary* defines "tend" as "[t]o be disposed toward (something)," "[t]o serve, contribute, or conduce in some degree or way; to have a more or less direct bearing or effect" and "[t]o be directed or have a tendency to (an end, object, or purpose)." *Black's Law Dictionary* 1696 (10th Ed.2014).

{¶ 49} Thus, evidence "tends to support" that a defendant used force in self-defense, and a defendant is entitled to a jury instruction on the defense of self-defense under R.C. 2901.05, as amended, where the evidence in the record is sufficient to raise a question of reasonable doubt of guilt, based on a claim of self-defense, in the mind of a reasonable juror. *See, e.g., State v. Tolle*, 4th Dist. Adams No. 19CA1095, 2020-Ohio-935, ¶ 23-24 (Evidence is sufficient to support a self-defense jury instruction under R.C. 2901.05, as amended, "'where a reasonable doubt of guilt has arisen based upon [the affirmative defense].' * * * In order for evidence [to] 'tend[]' to support an affirmative defense, it must be sufficient to raise a question in the mind of a reasonable juror."), quoting *State v. Melchior*, 56 Ohio St.2d 15, 20, 381 N.E.2d 195 (1978); *see also State v. Sullivan*, 11th Dist. Lake Nos. 2019-L-143 and 2019-L-144, 2020-Ohio-1439, ¶ 33-34, 45 ("When a defendant's testimony, if believed, would have raised the question of self-defense in the mind of

a reasonable juror, the defendant's burden of production has been met."). If the evidence presented "'generates only a mere speculation or possible doubt, such evidence is insufficient to raise the affirmative defense, and submission of the issue to the jury will be unwarranted.'" *Tolle* at ¶ 23, quoting *Melchior* at 20.

{¶ 50} The record reflects that, prior to denying Jacinto's request for a jury instruction on self-defense, the trial court carefully considered whether a self-defense jury instruction was appropriate, including eliciting and considering the arguments of counsel, analyzing applicable legal authority and re-reviewing the relevant testimony, the surveillance video footage and the recordings of Jacinto's statements to police. The trial court ultimately denied Jacinto's request for a jury instruction on self-defense because it found that no evidence had been presented that Jacinto felt that "his physical wellbeing was in any way, shape or form in danger" when he struck Lee.

{¶ 51} Based on the record before us, we cannot say that the trial court abused its discretion or otherwise erred in denying Jacinto's request for a self-defense jury instruction. *Tolle* at ¶ 26-32 (where the evidence presented was insufficient to create a question in the minds of reasonable jurors regarding whether defendant was "not at fault in creating the situation giving rise to the affray," trial court did not abuse its discretion in denying defendant's request for a self-defense instruction under R.C. 2901.05(B)(1), as amended). Even assuming a reasonable juror could find that Jacinto was not at fault in creating the situation that gave rise to the altercation, no evidence was presented that "tended to support" that Jacinto

believed he was in imminent danger of bodily harm prior to striking Lee or from which a rational juror could reasonably infer that Jacinto believed he was in imminent danger of bodily harm prior striking Lee.

{¶ 52} No evidence was presented that Lee struck, pushed or physically threatened Jacinto in any way or used any physically threatening, "fighting" words prior to Jacinto punching Lee. Although Contreras testified that Lee "poked" Jacinto in the chest, he indicated that the "poking" occurred approximately ten minutes before Jacinto punched Lee. Contreras testified that after the poking, the situation deescalated. The surveillance video confirms this.

{¶ 53} Jacinto did not testify at trial. In his police interviews, Jacinto told police that Lee "tapped" or "poked" him in the chest repeatedly, but indicated that he at no point he felt threatened by, or feared he might be physically harmed in any way by, Lee. According to his statements to police, Jacinto punched Lee because they were both "drunken idiots" and Jacinto was aggravated, annoyed or frustrated by his conversation with Lee and the fact Lee was "getting in [his] face" about it.

{¶ 54} After carefully reviewing the record in this case, we find that there was insufficient evidence to warrant a jury instruction on self-defense. There is no evidence from which a jury might reasonably conclude that Jacinto had a bona fide belief that he was in imminent danger of bodily harm. *Cf. State v. Arnett*, 11th Dist. Ashtabula No. 95-A-0005, 1995 Ohio App. LEXIS 3294, 3-4 (August 11, 1995) (insufficient evidence to warrant a jury instruction on self-defense where victim did not strike, push or threaten defendant and defendant testified that he struck victim

because victim accused him of something he did not do and poked his finger in defendant's face). Accordingly, the trial court did not abuse its discretion or otherwise err in failing to give a self-defense jury instruction.

{¶ 55} Although not identified as a separate assignment of error, Jacinto also contends that the trial court erred in excluding "extensive evidence of Mr. Lee's prior violent conduct, including that against court staff and that which had occurred at prior work functions" based on his claim of self-defense. "A trial court has broad discretion in admitting or excluding evidence, and a trial court's ruling on the admissibility of evidence will be upheld absent an abuse of that discretion and a showing of material prejudice." *See, e.g., State v. Ortiz-Vega*, 8th Dist. Cuyahoga No. 107694, 2019-Ohio-2918, ¶ 52. Jacinto acknowledges that a defendant asserting self-defense cannot introduce evidence of specific instances of a victim's conduct to prove that the victim was the initial aggressor. *See, e.g., State v. Barnes*, 94 Ohio St.3d 21, 759 N.E.2d 1240 (2002), syllabus. However, he contends that, because he was denied a self-defense instruction, this rule does not apply and he should have been permitted to introduce evidence of prior instances of "violent conduct" by Lee.

{¶ 56} There was no evidence Jacinto was aware of Lee's background at the time of the altercation. As such, it could not have had any bearing on Jacinto's state of mind. Jacinto has not shown that such evidence was admissible regardless of whether a self-defense instruction was provided or that he was materially prejudiced by the exclusion of this evidence. Jacinto's conclusory assertion in his brief that such evidence was "relevant, material, and otherwise admissible," without any

explanation or citation to legal authority supporting his assertion, does not satisfy his obligation under App.R. 16(A)(7).  An appellate court is not obliged to construct or develop arguments to support a defendant's assignment of error and "will not 'guess at undeveloped claims on appeal.'"  *See, e.g., State v. Piatt*, 9th Dist. Wayne No. 19AP0023, 2020-Ohio-1177, ¶ 39, quoting *McPherson v. Goodyear Tire & Rubber Co.*, 9th Dist. Summit No. 21499, 2003-Ohio-7190, ¶ 31; *see also State v. Collins*, 8th Dist. Cuyahoga No. 89668, 2008-Ohio-2363, ¶ 91 ("'[I]t is not the duty of this Court to develop an argument in support of an assignment of error if one exists.'"), quoting *State v. Franklin*, 9th Dist. Summit No. 22771, 2006-Ohio-4569, ¶ 19; App.R. 12(A)(2).

{¶ 57} We overrule Jacinto's first assignment of error.

**Admission of 911 Call**

{¶ 58} In his second assignment of error, Jacinto contends that the trial court abused its discretion in allowing the state to admit the recording of the 911 call without having the 911 caller testify and be subject to cross-examination.  Jacinto contends that call contained hearsay that "did not fit an exception" and that by allowing the state to play the 911 call for the jury, the trial court violated his constitutional right to confront the witnesses against him.

### Confrontation Clause

{¶ 59} The Sixth Amendment's Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him."  Only testimonial hearsay implicates the Confrontation

Clause. A statement is "testimonial" if it is made for "'a primary purpose of creating an out-of-court substitute for trial testimony.'" *State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, ¶ 87, quoting *Michigan v. Bryant*, 562 U.S. 344, 358, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011); *see also State v. Knox*, 8th Dist. Cuyahoga No. 107414, 2019-Ohio-1246, ¶ 67 ("[T]he core class of statements implicated by the Confrontation Clause" includes those "'made under circumstances which would lead an objective witness to reasonably believe that the statement would be available for use at a later trial.'"), quoting *Crawford v. Washington*, 541 U.S. 36, 52, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

{¶ 60} The admission of a testimonial, out-of-court statement by a declarant who does not testify at trial violates the Confrontation Clause unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. *Crawford* at 53-54, 68. We review evidentiary rulings that implicate the Confrontation Clause de novo. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 97.

{¶ 61} 911 calls are generally nontestimonial and are admissible if the statements contained therein satisfy a hearsay exception. As the United States Supreme Court explained in *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), in determining that a victim's statements to a 911 operator during and shortly after a violent attack by her boyfriend were nontestimonial:

> Without attempting to produce an exhaustive classification of all conceivable statements — or even all conceivable statements in response to police interrogation — as either testimonial or

nontestimonial * * * [s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

* * *

A 911 call * * * and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to "establis[h] or prov[e]" some past fact, but to describe current circumstances requiring police assistance.

*Id.* at 822, 827, quoting *Crawford* at 51. The court observed that, in the case of 911 calls, the declarants are generally "speaking about events as they [are] actually happening" and that "[a]lthough one might call 911 to provide a narrative report of a crime absent any imminent danger," 911 callers are typically facing ongoing emergencies. (Emphasis deleted.) *Davis* at 827. Under such circumstances, the 911 caller is not testifying; the 911 caller is not acting as a witness and the statements of a 911 caller are not testimonial in nature. *Id.* at 827-828.

{¶ 62} In *Michigan v. Bryant*, 562 U.S. 344, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011), the court clarified "what *Davis* meant" by "'an ongoing emergency'" and its role in determining whether a declarant's statements are testimonial for purposes of the Confrontation Clause. *Id.* at 359, quoting *Davis* at 822. The court rejected the Michigan Supreme Court's reading of *Davis* "as deciding that 'the statements made after the defendant stopped assaulting the victim and left the premises did not occur during an "ongoing emergency"'" and stated that "whether an emergency exists and

is ongoing is a highly context-dependent inquiry."   (Emphasis deleted.)  The court

explained:

> An objective analysis of the circumstances of an encounter and the statements and actions of the parties to it provides the most accurate assessment of the "primary purpose of the interrogation."  The circumstances in which an encounter occurs — e.g., at or near the scene of the crime versus at a police station, during an ongoing emergency or afterwards — are clearly matters of objective fact.  The statements and actions of the parties must also be objectively evaluated.  That is, the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred. * * *

> [T]he existence of an "ongoing emergency" at the time of an encounter between an individual and the police is among the most important circumstances informing the "primary purpose" of an interrogation.  * * *  The existence of an ongoing emergency is relevant to determining the primary purpose of the interrogation because an emergency focuses the participants on something other than "prov[ing] past events potentially relevant to later criminal prosecution."  *Davis*, 547 U.S. at 822, 126 S.Ct. 2266, 165 L.Ed.2d 224.  Rather, it focuses them on "end[ing] a threatening situation."  *Id.* at 832.

> * * *
> [T]he existence and duration of an emergency depend on the type and scope of danger posed to the victim, the police, and the public.

*Id.* at 360-361, 370-371.

{¶ 63} Statements made by a 911 caller in response to questioning by a 911 operator are likewise nontestimonial where the "primary purpose" of the exchange is to obtain assistance in an emergency.  *See, e.g.*, *Davis* at 822, 827-828; *State v. McGee*, 1st Dist. Hamilton No. C-150496, 2016-Ohio-7510, ¶ 16, citing *State v. Siler*, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, ¶ 24-25.

{¶ 64} Jacinto argues that the 911 call was testimonial in nature, at least in part, because the caller was not "attempting to provide police assistance to an ongoing criminal act," but rather, was "simply seeking to notify emergency services so that an ambulance could be sent." He also contends that the 911 call was testimonial because the caller, "[w]hile seeking medical assistance," "delved deeply into multiple, sometimes inconsistent, past events that would certainly be relevant in later criminal proceedings." We disagree.

{¶ 65} As explained above, when determining whether a 911 caller's statements are testimonial or nontestimonial, the issue is not whether the statements would "be relevant" in later criminal proceedings. The issue is the "primary purpose" for which the statements are made. Further, an "ongoing emergency" is not limited to circumstances imposing an ongoing, immediate threat of physical harm to a victim. "An ongoing emergency can exist after the original threat to the victim has ceased to exist if there is a potential threat to police or the public or the victim is in need of emergency medical services." *Cleveland v. Merritt*, 2016-Ohio-4693, 69 N.E.3d 102, ¶ 10 (8th Dist.), citing *Bryant*, 562 U.S. at 376, 131 S.Ct. 1143, 179 L.Ed.2d 93; *see also State v. Wade*, 11th Dist. Lake No. 2019-L-065, 2020-Ohio-2894, ¶ 35-37 (911 calls made immediately after a shooting to report the shooting and to obtain medical assistance for a victim who had been shot were nontestimonial).

{¶ 66} Based on *Davis*, this court has identified "four characteristics of a statement that meets the emergency exception": (1) the declarant describes

contemporaneous events rather than events that occurred hours earlier, (2) an objective emergency exists, (3) the questions asked of the declarant are necessary to resolve the emergency and (4) the interview is of an informal nature. *Cleveland v. Johnson*, 8th Dist. Cuyahoga No. 107930, 2019-Ohio-3286, ¶ 18, citing *State v. Clark*, 2016-Ohio-4561, 67 N.E.3d 182, ¶ 38 (8th Dist.), citing *Davis*, 547 U.S. at 826-830, 126 S.Ct. 2266, 165 L.Ed.2d 224. All four characteristics are present here.

{¶ 67} In this case, the 911 call was made by someone at the scene just after the incident occurred for the purpose of obtaining emergency medical services for Lee. The 911 caller describes the victim's current condition, informing the 911 operator that the victim was "knocked out," "barely breathing" and "gasping for air." Although the caller describes the immediately preceding events that gave rise to the need for emergency services, i.e., that the victim had been punched and knocked out and his head had hit the concrete, it is clear that the primary purpose of the caller's statements was not to establish or prove past events potentially relevant to later criminal prosecution, but rather, to obtain immediate emergency medical assistance for the victim. Simply because the 911 caller used the past tense and described certain events that had just occurred, rather than as they were occurring, does not mean that there was not an ongoing emergency that rendered his statements nontestimonial. *See, e.g., State v. Conyer*, 7th Dist. Mahoning No. 16 MA 0021, 2017-Ohio-7506, ¶ 11-20. There is nothing to suggest that caller was "giving testimony" or "speaking with the intention of providing testimony at a later time." *State v. Naugler*, 12th Dist. Madison No. CA2004-09-033, 2005-Ohio-6274, ¶ 22.

The caller was seeking immediate assistance and was providing information for that purpose.

{¶ 68} Although "a conversation which begins as an interrogation to determine the need for emergency assistance" can "'evolve into testimonial statements' * * * once that purpose has been achieved,'" this is not that case. *Davis* at 828, quoting *Hammon v. State*, 829 N.E.2d 444 (Ind.2005).

{¶ 69} The questions the 911 operator asked the caller, e.g., questions relating to the location of the perpetrator and the location and condition of the victim, clearly related to the ongoing emergency and were directed to determining the nature and scope of the emergency to which law enforcement or other responders would need to respond. *See, e.g., State v. Douglas*, 3d Dist. Marion Nos. 9-18-19 and 9-18-20, 2019-Ohio-2067, ¶ 29-30 (statements during 911 call were not testimonial where "dispatcher was determining the emergency to which law enforcement needed to respond; whether the victim needed medical attention; and whether law enforcement should be aware if the assailant was present").

{¶ 70} Although the 911 caller provided some limited information regarding the perpetrator, i.e., that he was a male and went into the hotel with another male after punching the victim, the focus of the call was not on the perpetrator or the "past events." The caller did not identify the perpetrator or even describe the perpetrator in any detail during the call; he simply indicated that the perpetrator had left the scene and went into the hotel. The "nature of what was asked and answered," viewed objectively, "was such that the elicited statements were necessary to be able to

resolve the present emergency, rather than simply to learn * * * what had happened in the past." *Davis*, 547 U.S. at 827, 126 S.Ct. 2266, 165 L.Ed.2d 224.

{¶ 71} Considering the totality of the circumstances, there is no indication in the record that any reasonable person in the position of the 911 caller would have intended to use the 911 call as a means of testifying regarding the events he was witnessing. The out-of-court statements by the 911 caller concerned an ongoing emergency and were not testimonial. Accordingly, no violation of the Confrontation Clause occurred.

{¶ 72} Having determined that the 911 emergency call was nontestimonial and, therefore, not barred by the Confrontation Clause, we next consider whether the call was admissible under an exception to the hearsay rules. *See State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 165.

### Applicable Hearsay Exceptions

{¶ 73} Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Hearsay is generally inadmissible unless it falls into one of the applicable exceptions. Evid.R. 802.

{¶ 74} Although Jacinto asserts that the 911 call "did not fit" any of the hearsay exceptions, he does not explain why he contends none of the relevant exceptions are applicable.

{¶ 75} Typically, 911 calls are admissible as either excited utterances or present sense impressions. *See, e.g., State v. Rose*, 8th Dist. Cuyahoga No. 89457,

2008-Ohio-1262, ¶ 42 ("Precedent overwhelmingly supports the conclusion that 911 calls are admissible either as excited utterances or present sense impressions."); *see also Wade*, 2020-Ohio-2894, at ¶ 28; *State v. Urso*, 195 Ohio App.3d 665, 2011-Ohio-4702, 961 N.E.2d 689, ¶ 69 (11th Dist.); *State v. Johnson*, 10th Dist. Franklin No. 08AP-652, 2009-Ohio-3383, ¶ 22.

{¶ 76} An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid.R. 803(2). The admission of a statement as an excited utterance "is not precluded by questioning which: (1) is neither coercive nor leading, (2) facilitates the declarant's expression of what is already the natural focus of the declarant's thoughts, and (3) does not destroy the domination of the nervous excitement over the declarant's reflective faculties." *State v. Wallace*, 37 Ohio St.3d 87, 524 N.E.2d 466 (1988), paragraph two of the syllabus. "There is no per se amount of time after which a statement can no longer be considered to be an excited utterance. The central requirements are that the statement must be made while the declarant is still under the stress of the event and the statement may not be the result of reflective thought." (Emphasis deleted.) *State v. Taylor*, 66 Ohio St.3d 295, 303, 612 N.E.2d 316 (1993); *see also Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, at ¶ 166.

{¶ 77} A present sense impression is "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or

condition, or immediately thereafter unless circumstances indicate lack of trustworthiness." Evid.R. 803(1).

{¶ 78} In this case, the statements by the 911 caller were admissible both as excited utterances and present sense impressions. The 911 caller reported an startling event he had personally observed just moments earlier, i.e., "[a] guy walked up to him and hit him and knocked him out and his head hit the concrete," and provided a contemporaneous description of the victim's condition as he was perceiving it, i.e., that the victim was unconscious, "barely breathing" and "gasping for air." Although the perpetrator had left the scene when the caller spoke with the 911 operator, the crisis was ongoing because the victim was in need of immediate medical attention. The tone of the caller's voice reflects that he is still under the stress of what he had just observed and what he was currently observing and there is a sense of urgency related to the condition of the victim for whom he is seeking emergency medical assistance. There is nothing to suggest that the caller's statements to the 911 operator were the result of reflective thought. The questions from the 911 operator were not coercive or leading; they facilitated the caller's expression of the natural focus of his thoughts — what had happened to the victim and the victim's present condition.

{¶ 79} Accordingly, the trial court did not violate the Confrontation Clause when it admitted the 911 call into evidence. The caller's statements were nontestimonial and were admissible under exceptions to the hearsay rule.

{¶ 80} Jacinto's second assignment of error is overruled.

### "Expert" Opinion Testimony by EMT

{¶ 81} In his third assignment of error, Jacinto contends that the trial court erred in allowing Hyde, a paramedic who treated Lee, to offer expert opinion testimony regarding the amount of force needed to cause Lee's injuries, the direction from which that force would come and whether Lee was knocked unconscious prior to hitting the ground. Jacinto asserts that the trial court erred in admitting this opinion testimony because (1) it did not meet the requirements for lay opinion testimony under Evid.R. 701; (2) Hyde's opinions were not disclosed in an expert report as required under Crim.R. 16(K), (3) Hyde lacked the expertise necessary to render the proffered "expert" opinions under Evid.R. 702 and (4) Hyde's opinions were based on "assumptions" and lacked an adequate factual foundation. Jacinto argues that his conviction should be vacated and that he should be granted a new trial based on the improper admission of this testimony.

{¶ 82} Evid.R. 701 governs opinion testimony by lay witnesses. It provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

{¶ 83} Evid.R. 702 governs the admissibility of expert testimony. A witness may testify as an expert if all of the following apply: (1) the witness' testimony relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons; (2) the witness is qualified as an expert by specialized knowledge, skill, experience, training or education regarding

the subject matter of the testimony and (3) the witness' testimony is based on reliable scientific, technical or other specialized information. Evid.R. 702. In addition, Crim.R. 16(K) requires that a party seeking to introduce expert testimony provide a written expert report "summarizing the expert witness'[] testimony, findings, analysis, conclusions, or opinion" and "qualifications." *See also State v. Boaston*, Slip Opinion No. 2020-Ohio-1061, ¶ 59 (trial court erred in admitting expert opinion testimony on topics that were not set forth in a written report prepared in compliance with Crim.R. 16(K)). The purpose of the rule "'to avoid unfair surprise by providing notice to the defense and allowing the defense an opportunity to challenge the expert's findings, analysis, or qualifications, possibly with the support of an adverse expert who could discredit the opinion after carefully reviewing the written report.'" *Boaston* at ¶ 48, quoting *State v. Perry*, 11th Dist. Lake No. 2011-L-125, 2012-Ohio-4888, ¶ 55.

{¶ 84} The state contends that Hyde's testimony on direct examination that (1) Lee's injuries were consistent with someone being punched and immediately knocked unconscious rather than someone being punched and losing consciousness only after hitting the ground and (2) "it would take a significant amount of force to knock someone into unconsciousness before even hitting the ground" was admissible lay opinion testimony under Evid.R. 701, because it was rationally based on his perception and was helpful to the jury because it helped the jury to understand "not only [that] Lee suffered serious physical harm, but how he suffered that harm." (Emphasis deleted.) The state asserts that it was defense counsel who

"tried to elicit expert testimony from Hyde" by asking Hyde, on cross-examination, "[i]n order to knock somebody out, how much force is required, specific PSI or pounds" and "what happened here."

**{¶ 85}** "'The line between expert testimony under Evid.R. 702 and lay opinion testimony under Evid.R. 701 is not always easy to draw.'" *State v. Mathis*, 8th Dist. Cuyahoga No. 107365, 2019-Ohio-3654, ¶ 59, quoting *Hetzer-Young v. Elano Corp.*, 2016-Ohio-3356, 66 N.E.3d 234 (2d Dist.). As the Ohio Supreme Court has stated:

> [C]ourts have permitted lay witnesses to express their opinions in areas in which it would ordinarily be expected that an expert must be qualified under Evid.R. 702. * * * Although these cases are of a technical nature in that they allow lay opinion testimony on a subject outside the realm of common knowledge, they still fall within the ambit of the rule's requirement that a lay witness's opinion be rationally based on firsthand observations and helpful in determining a fact in issue. These cases are not based on specialized knowledge within the scope of Evid.R. 702, but rather are based upon a layperson's personal knowledge and experience.

*State v. McKee*, 91 Ohio St.3d 292, 296-297, 744 N.E.2d 737 (2001).

**{¶ 86}** However, a distinction between lay opinion testimony and expert opinion testimony remains. "[L]ay person opinion testimony 'results from a process of reasoning familiar in everyday life, while expert opinion testimony results from a process of reasoning that only specialists in the field can master.'" *State v. Russell*, 12th Dist. Butler No. CA2012-08-156, 2013-Ohio-3079, ¶ 36, quoting *State v. Lewis*, 192 Ohio App.3d 153, 2011-Ohio-187, 948 N.E.2d 487, ¶ 23 (5th Dist.). We review a trial court's determination of the admissibility of lay witness opinion testimony for

abuse of discretion. *Mathis*, 2019-Ohio-3654, at ¶ 59, citing *State v. Allen*, 8th Dist. Cuyahoga No. 92482, 2010-Ohio-9, ¶ 46.

{¶ 87} Following a thorough review of the record, we agree that Hyde's testimony exceeded the scope of permissible lay opinion testimony under Evid.R. 701. What happened within Lee's brain after Jacinto punched him, what happened within Lee's brain after he hit the ground and the amount and direction of the force required to cause Lee's brain injury were not matters "rationally based on [Hyde's] perception." Evid.R. 701. We likewise agree that Hyde's opinions regarding these issues were not properly admitted under Crim.R. 16(K) and Evid.R. 702. No expert report was provided to the defense — aside from the EMS report which did not address these issues — and Hyde was not shown to have any expertise or specialized training in traumatic brain injuries or the forces required to cause those injuries as would be necessary to render expert opinions regarding these issues.

{¶ 88} Nevertheless, we find that the trial court's error in admitting this testimony was harmless. Crim.R. 52(A) provides: "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." *See also* R.C. 2945.83(C) ("No motion for a new trial shall be granted or verdict set aside, nor shall any judgment of conviction be reversed in any court because of * * * [t]he admission or rejection of any evidence offered against or for the accused unless it affirmatively appears on the record that the accused was or may have been prejudiced thereby."); *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 24 ("Not every error requires that a conviction be vacated or a new trial granted."). In order

to prejudice a defendant, i.e., to "affect" a defendant's "substantial rights" under Crim.R. 52(A), the error "'must have affected the outcome of the [trial] court proceedings.'" *State v. Fisher*, 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, ¶ 7, quoting *United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

{¶ 89} The Ohio Supreme Court has articulated a "three-part analysis" to be used in determining whether the erroneous admission of evidence "affected the defendant's substantial rights so as to require a new trial or whether the admission of that evidence was harmless error under Crim.R. 52(A)." *Boaston*, Slip Opinion No. 2020-Ohio-1061, at ¶ 63. As the court explained in *Boaston*:

> "First, it must be determined whether the defendant was prejudiced by the error, i.e., whether the error had an impact on the verdict. [*Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, at ¶ 25, 27]. Second, it must be determined whether the error was not harmless beyond a reasonable doubt. *Id.* at ¶ 28. Lastly, once the prejudicial evidence is excised, the remaining evidence is weighed to determine whether it establishes the defendant's guilt beyond a reasonable doubt. *Id.* at ¶ 29, 33."

*Boaston* at ¶ 63-70 (improper admission of deputy coroner's expert opinions beyond the scope of her report did not affect the substantial rights of the defendant where the remaining evidence adduced by the state established the defendant's guilt beyond any reasonable doubt), quoting *State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 37.

{¶ 90} Applying that analysis in this case, we find that Jacinto was not prejudiced by the admission of Hyde's testimony and that the trial court's error in

admitting Hyde's improper opinion testimony was harmless beyond a reasonable doubt. As detailed above and further explained below, the state presented ample evidence besides Hyde's testimony establishing Jacinto's guilt beyond any reasonable doubt. Whether Jacinto lost consciousness immediately after he was punched and before his head hit the ground or whether he lost consciousness only after his head hit the ground "was not essential" to the state's prosecution of the felonious assault charge. *Boaston* at ¶ 64. Regardless of how or when Lee lost consciousness, i.e., whether Lee was rendered unconscious by the punch itself or became unconscious only after his head struck the ground, there was ample evidence to support the jury's finding, beyond a reasonable doubt, that Jacinto knowingly caused serious physical harm to Lee by punching him.

{¶ 91} Further, Hyde's testimony that a significant amount of force was necessary to cause Lee's injuries and that Jacinto's punch could have been the source of that force was duplicative of testimony by Dr. Brown, who testified that Lee's brain injury came either from the punch or the fall that followed and that the punch involved a "pretty significant amount of force" given the significant acute swelling and bruising she observed on Lee's jaw. No one disputes that her testimony was properly admitted by the trial court. The fact that Jacinto punched Lee with significant force was also clear from Jacinto's statement to detectives that, after he punched Lee once, Lee "let out a loud snore" and immediately fell to the ground.

{¶ 92} Accordingly, we overrule Jacinto's third assignment of error.

**Sufficiency of the Evidence**

{¶ 93} In his fifth assignment of error, Jacinto contends that his conviction should be overturned because there was insufficient evidence that Jacinto "knowingly" caused serious physical harm to Lee.

{¶ 94} A challenge to the sufficiency of the evidence supporting a conviction requires a determination of whether the state met its burden of production at trial. *State v. Hunter*, 8th Dist. Cuyahoga No. 86048, 2006-Ohio-20, ¶ 41. When reviewing sufficiency of the evidence, an appellate court must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. In a sufficiency inquiry, an appellate court does not assess whether the evidence is to be believed but whether, if believed, the evidence admitted at trial would support a conviction beyond a reasonable doubt. *State v. Starks*, 8th Dist. Cuyahoga No. 91682, 2009-Ohio-3375, ¶ 25; *Jenks* at paragraph two of the syllabus.

{¶ 95} Jacinto was convicted of felonious assault in violation of R.C. 2903.11(A)(1), which provides, in relevant part: "No person shall knowingly * * * [c]ause serious physical harm to another." For purposes of his sufficiency argument, Jacinto does not dispute that the state presented sufficient evidence that he caused serious physical harm to Lee. Rather, Jacinto contends that the state lacked

sufficient evidence to prove beyond a reasonable doubt that he "knew" his punch "could cause serious physical harm."

{¶ 96} Jacinto first argues that the state did not present "any legitimate evidence" that Jacinto "knowingly" caused Lee serious physical harm and, instead, "relied heavily on allegations that [Jacinto] was an MMA fighter" to support his conviction. Jacinto contends that because it is a "universal truth" that "[d]runk people tell tall tales," his "drunken[ ] boasting about his skills" could not be considered "evidence" that Jacinto knew his punch could cause serious physical harm to Lee.

{¶ 97} Simply because an individual made statements while intoxicated does not mean those statements cannot be believed and used to support a conviction. *Cf. State v. Melton*, 8th Dist. Cuyahoga No. 103341, 2016-Ohio-1227, ¶ 7 (intoxication "bears upon" a witness' credibility, but it does not render a witness' testimony "per se incredible"). Although Jacinto told police after the incident that he was simply "boasting" when he told others he was an MMA fighter and that, in fact, he did not "even know how to fight," Contreras testified that he had an extended conversation with Jacinto regarding their training histories and experience with fighting. Accordingly, the jury could have reasonably determined that Jacinto had fighting experience and knew what he was doing when he struck Lee in the jaw.

{¶ 98} Even if, however, Jacinto had had no fighting experience, it would not preclude a rational jury from finding, beyond a reasonable doubt, that Lee knowingly caused Lee serious physical harm.

{¶ 99} Although Jacinto may not have specifically intended to cause Lee any serious physical harm — much less the catastrophic injuries Lee ultimately sustained — and although Jacinto may not have known that his punch would cause the particular injuries Lee sustained, "neither [Jacinto's] purpose nor his lack of knowledge that his act would cause the precise injury [Lee] suffered are the relevant inquires when examining the evidence required to establish the knowingly element." *State v. Murphy*, 9th Dist. Summit No. 24753, 2010-Ohio-1038, ¶ 20.

{¶ 100} To have acted "knowingly," a person need not have specifically intended to cause a particular result. "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). In other words, a defendant acts knowingly when, although not necessarily intending a particular result, he or she is aware that the result will probably occur.

{¶ 101} If a result is a probable consequence of a voluntary act, the actor "'will be held to have acted knowingly to achieve it'" because a person "'is charged by the law with knowledge of the reasonable and probable consequences of his [or her] own acts'." *State v. Dixon*, 8th Dist. Cuyahoga No. 82951, 2004-Ohio-2406, ¶ 16, quoting *State v. McDaniel*, 2d Dist. Montgomery No. 16221, 1998 Ohio App. LEXIS 2039, 16 (May 1, 1998); *see also State v. McCurdy*, 10th Dist. Franklin No. 13AP-321, 2013-Ohio-5710, ¶ 16 ("'[F]elonious assault under R.C. 2903.11, combined with the definition of "knowingly" found in R.C. 2901.22(B), does not require that a defendant intended to cause "serious physical harm," but rather, that

the defendant acted with an awareness that the conduct probably would cause such harm.'") (emphasis deleted), quoting *State v. Smith*, 10th Dist. Franklin No. 04Ap-726, 2005-Ohio-1765, ¶ 28. "Stated another way, when a defendant voluntarily acts in a manner that is likely to cause serious physical injury, the factfinder can infer that the defendant was aware that his actions would cause whatever injury results from his actions, or, in other words, that he acted knowingly." *State v. Reed*, 8th Dist. Cuyahoga No. 89137, 2008-Ohio-312, ¶ 10. "'To be actionable it is only necessary that the result is within the natural and logical scope of risk created by the conduct.'" *State v. Hampton*, 8th Dist. Cuyahoga No. 103373, 2016-Ohio-5321, ¶ 13, quoting *State v. Smith*, 4th Dist. Ross No. 06CA2893, 2007-Ohio-1884, ¶ 29. The defendant need not have known that his or her actions would cause the precise injury sustained by the victim. *See, e.g., State v. Perez*, 8th Dist. Cuyahoga No. 91227, 2009-Ohio-959, ¶ 42, citing *Dixon* at ¶ 24; *see also Hampton* at ¶ 13 ("A person need not foresee the precise consequences of criminal conduct.").

{¶ 102} Absent an admission, whether a defendant acted "knowingly" must be determined "from all the surrounding facts and circumstances, including the doing of the act itself." *Dixon* at ¶ 16, quoting *State v. Huff*, 145 Ohio App.3d 555, 563, 763 N.E.2d 695 (1st Dist.2001).

{¶ 103} Jacinto argues that there was insufficient evidence that he knowingly caused Lee serious physical harm because it was "not reasonable to believe," under the circumstances, that a single punch would cause "serious physical harm." We disagree.

{¶ 104} "Serious physical harm," as defined in R.C. 2901.01(A)(5), is very broad and includes any of the following:

> (a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

> (b) Any physical harm that carries a substantial risk of death;

> (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

> (d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

> (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

Loss of consciousness, "'irrespective of its duration,'" has been found to constitute severe physical harm under R.C. 2901.01(A)(5)(c). *Watson*, 2018-Ohio-4964, ¶ 11, quoting *State v. Sales*, 9th Dist. Summit No. 25036, 2011-Ohio-2505, ¶ 19.

{¶ 105} In support of his argument that the evidence did not demonstrate he knowingly caused serious physical harm to Lee, Jacinto cites *State v. McCleod*, 7th Dist. Jefferson No. 00 JE 8, 2001-Ohio-3480, and *State v. McFadden*, 10th Dist. Franklin No. 95APA03-384, 1995 Ohio App. LEXIS 5144 (Nov. 21, 1995). In *McFadden*, the defendant was convicted of felonious assault after throwing one "blind-side punch" to the right side of the victim's head. *Id.* at 4, 12. The defendant and the victim were of "similar size and body weight" and the defendant lacked any "boxing or fighting experience." *Id.* at 11. The court indicated that, under the circumstances of that case, while it was "reasonable to assume that a person would

expect one punch to cause physical harm to another person," it could not be said that "a reasonably prudent person would have been aware that the throwing of one punch had the propensity to cause serious physical harm to another person." *Id.* at 11-12. Accordingly, the court held that the evidence was insufficient to convict the defendant of felonious assault. *Id.*

{¶ 106} In *McCleod*, the Seventh District held that the trial court's failure to instruct the jury on assault warranted a reversal of the defendant's conviction for felonious assault. 2001-Ohio-3480 at ¶ 1, 57. In that case, the defendant had "sucker-punched" and possibly kicked his victim. The court held that a reasonable jury could have acquitted the defendant of felonious assault because it was "not clear" that he was aware that one punch and possibly a kick "would certainly or likely result in the type of serious injury which occurred." *Id.* at ¶ 45. That is not the issue in this case. In this case, the trial court instructed the jury both on felonious assault and assault.

{¶ 107} In numerous other cases, this court and others have held that a single punch to the head or face can support a conviction for felonious assault even in the absence of evidence that the defendant had fighting or boxing experience or was "more physically imposing" than the victim. *See, e.g., Watson,* 2018-Ohio-4964, at ¶ 16 (affirming felonious assault conviction where defendant struck the victim "with a strong closed fist punch to the side of his head" with enough force "that it knocked [the victim] to the ground, left him unconscious for an extended period of time, and damaged his skull and brain"); *State v. Eisenman,* 10th Dist.

Franklin No. 17AP-475, 2018-Ohio-934, ¶ 11-12 (affirming felonious assault conviction where defendant punched the victim once in the head with sufficient force to "knock [the victim] out immediately"); *Hampton*, 2016-Ohio-5321, at ¶ 2, 14, 24, 27-28 (evidence of a single, forceful intentional punch to the head could support the inference that defendant knowingly caused serious physical harm); *State v. Westfall*, 9th Dist. Lorain No. 10CA009825, 2011-Ohio-5011, ¶ 2, 10 (single punch to the victim's face was sufficient to support felonious assault conviction); *State v. Shepherd*, 11th Dist. Ashtabula No. 2003-A-0028, 2006-Ohio-4315, ¶ 28 (one punch to the face with sufficient force to crack two of the victim's teeth was sufficient to support a conviction for felonious assault); *see also State v. Redman*, 3d Dist. Allen No. 1-15-54, 2016-Ohio-860, ¶ 22 ("'Punching someone in the face satisfies the requisite culpable mental state for felonious assault.'"), quoting *State v. Beaver*, 3d Dist. Union No. 14-13-15, 2014-Ohio-4995, ¶ 37; *State v. Vanover*, 4th Dist. Lawrence No. 98CA38, 1999 Ohio App. LEXIS 2357, 14-15 (May 16, 1999) ("[T]he mere act of punching someone in the head area carries with it the risk of causing serious physical harm. * * * Serious physical harm is unquestionably a natural and logical consequence of punching, without warning or provocation, an intoxicated person whose faculties are likely impaired.").

{¶ 108} As explained above, the determination of whether a defendant acted knowingly requires a review of all the relevant facts and circumstances. *See, e.g., State v. Porter*, 10th Dist. Franklin No. 19AP-29, 2019-Ohio-4868, ¶ 18 ("[I]n analyzing an attack, inferences about mens rea depend on the nature and

circumstances of the event."). In this case, the evidence shows that Lee weighed 180 pounds. After Jacinto punched Lee in the jaw, he immediately fell to the ground, was unconscious and gasping for breath and sustained a severe brain injury. Dr. Brown could not state whether Lee's brain injury came from the punch or the fall that followed, but testified that a "pretty significant amount of force" would have been necessary to cause the significant acute swelling and bruising she observed on Lee's jaw. This was not a case of a light jab or minor clip. Jacinto's punch was a voluntary, significant, forceful blow to Lee's face.

{¶ 109} As the court explained in *State v. Ayers*, 3d Dist. Marion No. 9-81-1, 1981 Ohio App. LEXIS 10550 (Aug. 18, 1981), in concluding that there was sufficient evidence to support a felonious assault conviction where the defendant hit the victim twice with his fist with sufficient force to break his cheekbone:

> [T]he evidence clearly shows the blows were directed to the victim's face and head. This is the site of the sense of smell, of taste, of sight, and of hearing. It is the situs of the brain. As such, any violent blow can be expected to probably cause * * * some temporary substantial incapacity and to cause acute pain of such duration as to result in substantial suffering.

*Id.* at 4.

{¶ 110} Although Jacinto may not have reasonably anticipated that Lee would sustain a serious brain injury, considering all the circumstances, it could be reasonably inferred that Jacinto knew that some form of serious physical harm to Lee was a reasonable and probable consequence of his forceful punch to Lee's jaw. Furthermore, after punching Lee and seeing him fall to the ground, Jacinto simply

walked away. Jacinto's response to the immediate impact of his punch could reasonably support the inference that Jacinto was "unsurprised by its severity" and that Jacinto was aware that his punch to Lee's jaw would probably cause him serious physical harm. *See Watson*, 2018-Ohio-4964, at ¶ 16.

{¶ 111} Viewing the evidence in the light most favorable to the state and considering the reasonable inferences to be drawn therefrom, we find that the evidence presented was sufficient to support a finding, beyond a reasonable doubt, that Jacinto knew that his conduct would probably cause serious physical harm to Lee.

{¶ 112} Accordingly, we overrule Jacinto's fifth assignment of error.

### Manifest Weight of the Evidence

{¶ 113} In his fourth assignment of error, Jacinto contends that his felonious assault conviction was against the manifest weight of the evidence.

{¶ 114} In contrast to a challenge based on sufficiency of the evidence, a manifest weight challenge attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13. Weight of the evidence "addresses the evidence's effect of inducing belief," i.e., "whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1977). When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the appellate court functions as a

"thirteenth juror" and may disagree "with the factfinder's resolution of * * * conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). The appellate court examines the entire record, weighs the evidence and all reasonable inferences that may be drawn therefrom, considers the witnesses' credibility and determines whether, in resolving conflicts in the evidence, the trier of fact "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Reversal on manifest weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175.

{¶ 115} Jacinto contends that jury lost its way and that his felonious assault conviction was against the manifest weight of the evidence because Jacinto and Lee were engaged in "mutual combat" and there was "no legitimate evidence" establishing that Jacinto caused the injuries Lee suffered as a result of their "mutual combat."

{¶ 116} Jacinto has cited no legal authority in support of his "mutual combat" argument. Under such circumstances, an appellate court may properly disregard an assignment of error. *See* App.R. 12(A)(2); App.R. 16(A)(7); *State v. Lynch*, 8th Dist. Cuyahoga No. 95770, 2011-Ohio-3062, ¶ 18 (If an argument exists that can support an inadequately argued assignment of error, it is not the duty of the appellate court "'to root it out.'"), quoting *Cardone v. Cardone*, 9th Dist. Summit Nos. 18349 and

18673, 1998 Ohio App. LEXIS 2028, 22 (May 6, 1998); *see also State v. Lynch*, 8th Dist. Cuyahoga No. 95770, 2011-Ohio-3062, ¶ 16-17 (observing that the "only place" in which the court found "mention of the term mutual combat" was in connection with jury instructions on voluntary manslaughter and in which "mutual combat" was defined as "'[a] consensual fight on equal terms — arising from a moment of passion but not in self-defense — between two persons armed with deadly weapons'"), quoting *Black's Law Dictionary* 1045 (8th Ed.2004); *State v. Shane*, 63 Ohio St.3d 630, 635, 590 N.E.2d 272 (1992) (listing "mutual combat" as a "classic" example of a "voluntary manslaughter situation").

{¶ 117} Indeed, courts have held that "where two persons agree to fight each other in a non-competitive boxing situation, each may be held guilty of * * * felonious assault * * * where the harm visited upon one of the fighters constitutes serious physical harm." *McCurdy*, 10th Dist. Franklin No. 13AP-321, 2013-Ohio-5710, ¶ 21; *State v. Dunham*, 118 Ohio App.3d 724, 729-730, 693 N.E.2d 1175 (1st Dist.1997) ("The fact that street fighters agree to engage in a public brawl to settle old or current differences cannot and does not negate the penal consequences. * * * [W]here * * * two persons agree to fight each other not in conformity with statutes authorizing boxing matches, each may be held guilty of assault, and where * * * the harm visited upon one of the fighters constitutes serious physical harm, the fact that the fight was begun by mutual consent is not a defense, in law, to a charge brought pursuant to R.C. 2903.11(A)(1)."); *see also In re D.W.*, 8th Dist. Cuyahoga No. 79262, 2002-Ohio-4173, ¶ 47-48.

{¶ 118} Finally, even if some "mutual combat" defense applied to the charge here, Jacinto has not shown that he and Lee were engaged in "mutual combat" at the time Lee's injuries occurred. The 911 caller stated that "[a] guy walked up to [Lee] and hit him and knocked him out and his head hit the concrete." Jacinto admitted to Detective Reese that Lee did not punch, push or hit him and that "the only thing that happened was me hurting him at the end." He told the detective that he hit Lee "in the head or in the jaw" once and "that's it," that Lee did not hit his head on anything "on the way down" and that Lee "went to sleep" after he hit him and was "unconscious and snoring when he hit the ground."

{¶ 119} After a careful review of the record in its entirety, weighing the strength and credibility of the evidence presented and the inferences to be reasonably drawn therefrom, we cannot say that this is one of those "exceptional cases" in which the trial court clearly lost its way and created such a manifest miscarriage of justice that Jacinto's conviction for felonious assault was against the manifest weight of the evidence. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717.

{¶ 120} Jacinto's fourth assignment of error is overruled.

### Challenge to Sentence

{¶ 121} In his sixth and final assignment of error, Jacinto argues that his conviction should be overturned because the trial court failed to "properly consider" the principles and purposes of sentencing under R.C. 2929.11 and the relevant

sentencing factors under R.C. 2929.12 when sentencing him to a four-year prison term. Jacinto's argument is meritless.

{¶ 122} When sentencing a defendant for a felony offense, a trial court must consider both the principles and purposes of felony sentencing set forth in R.C. 2929.11 and the seriousness and recidivism factors set forth in R.C. 2929.12. *State v. Hodges*, 8th Dist. Cuyahoga No. 99511, 2013-Ohio-5025, ¶ 7. A sentence imposed for a felony shall be "reasonably calculated" to achieve "three overriding purposes of felony sentencing" (1) protect the public from future crime by the offender and others, (2) punish the offender and (3) promote the effective rehabilitation of the offender "using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local resources." R.C. 2929.11(A), (B). In addition, the sentence imposed "shall be commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim" and "consistent with sentenced imposed for similar crimes committed by similar offenders." R.C. 2929.11(B).

{¶ 123} A court imposing a felony sentence "has discretion to determine the most effective way to comply" with these purposes and principles of sentencing. R.C. 2929.12(A). R.C. 2929.12 sets forth a nonexhaustive list of factors related to the seriousness of the offender's conduct and the likelihood the offender will commit future crimes that the trial court must consider when imposing a sentence.

{¶ 124} Jacinto first argues that his sentence should be vacated because the trial court improperly considered the seriousness of Lee's injuries when imposing

his sentence.  Jacinto asserts that because "[s]erious physical harm is an element of felonious assault," it "cannot be used to elevate the seriousness of [Jacinto's] conduct."  This court, however, previously rejected such an argument in *State v. Davis-Bey*, 8th Dist. Cuyahoga No. 79524, 2002-Ohio-3437.  As the court explained:

> Although [the defendant] contends that the trial court erred in considering the seriousness of the victim's injury because serious injury is one of the elements of the offense of felonious assault, this argument ignores the fact that there are different degrees of serious harm.  As the court held in *State v. Patterson*, [10th Dist. Franklin No. 99AP-105, 1999 Ohio App. LEXIS 5975 (Dec. 14, 1999)]:
>
> * * *
>
> Defendant's contentions * * * ignore the reality that serious physical harm may be in different degrees. Something less than the severe beating [the victim] endured may well constitute serious physical harm for purposes of R.C. 2903.11(A)(1), but not be a worst form of the offense for purposes of the sentencing statute.

*Davis-Bey* at ¶ 24-25; *see also State v. Galindo-Barjas*, 7th Dist. Mahoning No. 12 MA 37, 2013-Ohio-431, ¶ 1, 11-12 ("Even though 'serious physical harm' is an element of aggravated vehicular assault, there is a range of harm possible within the concept of what constitutes 'serious physical harm'"; trial court was permitted to consider the kind and extent of harm to the victim in imposing sentence even though that harm "form[ed] an element of the crime.").

{¶ 125}  Jacinto next argues that his sentence should be vacated because "the evidence within the record does not comport with the sentence imposed" in light of R.C. 2929.11 and 2929.12.  Jacinto points out that he had no prior criminal history, that both he and Lee were "highly intoxicated" at the time of the incident, that the

PSI indicated that Jacinto had a low risk of reoffending, that he "conveyed heartfelt remorse for the events of that night" and that "extensive support letters" had been submitted on his behalf at sentencing.

{¶ 126} Although the trial court must consider the principles and purposes of felony sentencing set forth in R.C. 2929.11 and the relevant sentencing factors listed in R.C. 2929.12 when sentencing a defendant, R.C. 2929.11 and 2929.12 are not "fact-finding statutes." *See, e.g., State v. Black,* 8th Dist. Cuyahoga No. 108551, 2020-Ohio-3117, ¶ 13; *State v. White*, 8th Dist. Cuyahoga No. 106580, 2018-Ohio-3414, ¶ 9; *State v. Gaines*, 8th Dist. Cuyahoga No. 103476, 2016-Ohio-4863, ¶ 11. Thus, the trial court is not required to make findings or give specific reasons for imposing more than the minimum sentence. *Black* at ¶ 13.

{¶ 127} Where, as here, a sentence is imposed solely after consideration of the factors in R.C. 2929.11 and 2929.12, "[a]n appellate court may vacate or modify any sentence that is not clearly and convincingly contrary to law only if the appellate court finds by clear and convincing evidence that the record does not support the sentence." *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 23. "'Clear and convincing evidence is that measure or degree of proof * * * which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *State v. Franklin*, 8th Dist. Cuyahoga No. 107482, 2019-Ohio-3760, ¶ 29, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. This is an "extremely deferential" standard of review. *State v. Venes*, 2013-Ohio-1891, 992 N.E.2d 453, ¶ 21 (8th Dist.).

**{¶ 128}** As a general matter, a sentence is not contrary to law where the trial court considers the purposes and principles of sentencing under R.C. 2929.11 and the seriousness and recidivism factors listed in R.C. 2929.12, properly applies postrelease control and sentences a defendant within the permissible statutory range. *See, e.g., State v. Barnes*, 8th Dist. Cuyahoga No. 108360, 2020-Ohio-665, ¶ 6; *State v. A.H.*, 8th Dist. Cuyahoga No. 98622, 2013-Ohio-2525, ¶ 10. A trial court's statement in its sentencing journal entry that it considered the required principles, purposes and sentencing factors is sufficient to fulfill a trial court's obligations under R.C. 2929.11 and 2929.12. *White,* 2018-Ohio-3414, at ¶ 9.

**{¶ 129}** In this case, the trial court expressly stated at the sentencing hearing that it had "considered" both "the principles and purposes of sentencing" and the relevant sentencing factors. It likewise stated in its sentencing journal entry that it "considered all required factors of the law" and "finds that prison is consistent with the purpose of R.C. 2929.11." The trial court, therefore, fulfilled its obligations under R.C. 2929.11 and 2929.12 when sentencing Jacinto.

**{¶ 130}** Although it was not required to do so, at the sentencing hearing, the trial court explained its evaluation of the relevant sentencing factors and its rationale for imposing a four-year prison sentence as follows:

> [T]he sentencing factors regarding the conduct is less serious, that the victim induced or facilitated the offense, that the offender acted under strong provocation, I don't believe that those really apply here.
>
> Mr. Contreras was very clear that he had to hold Mr. Jacinto back for at least three minutes, and the video corroborated that.

\* \* \*

Mr. Contreras was very clear that the victim was simply telling the defendant that he needed to be more respectful, that he can't use the language that he was using that night, that he'll get ahead in life if he maybe changes the way that he talks to people or it was — he was basically giving him a mentorship speech; and I think that the defendant's pride was injured.

And, obviously, yes, alcohol did have a lot to do with it, but I don't agree with some of the assertions made that it could have been the other way, it could have happened the other way.

\* \* \*

[P]articularly having sat through this trial, I was — I put a lot of emphasis on the defendant's conduct before and after this punch.

And like I stated, he had several opportunities to go inside. He had several opportunities from Mr. Contreras to back down because Mr. Contreras stated that he was ready to go. He was ready to fight. That switch went off in his head.

And Mr. Contreras going up in the elevator with him was afraid of the defendant. And the conduct after is what really, really struck me; is that in the defendant's statement to the detective, he knew that he — when he threw that punch, that the defendant was knocked out and he left him on the sidewalk in the city that was unknown to him alone and left him while he was passed out at 3:00 something in the morning.

So I do consider the defendant's conduct before and after, but I also consider the fact that it was one punch; that although the jury found that he knew or should have known to cause serious physical harm — like I said, that degree of serious physical harm is what separates each individual felonious assault.

You cannot treat all of them the same. I don't think that he intended to cause that degree of serious physical harm. But then again, also I do need to consider that there was a high degree of serious physical harm. Not all serious physical harms can be treated the same.

So I have considered the principles and purposes of sentencing. I've carefully reviewed the record, the defendant's history, the

presentence investigation, all of the letters, the reports, the recidivism factors, which I believe are neutral because there is no history.

I understand that he's low-to-moderate, but the anger and alcohol issues we don't know if they're going to represent themselves in the future.

I have considered the statements here today, the impact on the victim, the impact on the defendant's family.

I understand that any sentence the Court imposes must use the minimum sanctions that the Court determines to accomplish these purposes without imposing an unnecessary burden on the state or local resources.

So after considering and having sat through this trial, having considered the sentencing factors, I do believe that a prison sentence is consistent with the principles and purposes of sentencing and the defendant is not amenable to a community control sanction.

And, therefore, I'm imposing a period of incarceration of four years.

{¶ 131} The record reflects that the trial court thoroughly and thoughtfully considered the principles and purposes of sentencing under R.C. 2929.11 and the relevant sentencing factors under R.C. 2929.12 in imposing a four-year prison sentence. A trial court's sentencing decisions are entitled to deference; we are not permitted to simply substitute our judgment for that of the trial court. *See, e.g., State v. Shivers*, 8th Dist. Cuyahoga No. 105621, 2018-Ohio-99, ¶ 9; *Franklin*, 2019-Ohio-3760, ¶ 47. Following a careful review of the record in its entirety, we cannot say that Jacinto's sentence is clearly and convincingly unsupported by the record.

{¶ 132} Jacinto's sixth assignment of error is overruled.

{¶ 133} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

ANITA LASTER MAYS, P.J., CONCURS;
LARRY A. JONES, SR., J., DISSENTS
WITH SEPARATE OPINION

LARRY A. JONES, SR., J., DISSENTING:

{¶ 134} Respectfully, I dissent and would sustain Jacinto's first assignment of error and remand for a new trial.

{¶ 135} I believe the evidence was sufficient to warrant a jury instruction on self-defense. The evidence (testimonial and video) shows that Jacinto and Lee, who were both heavily intoxicated, had been engaged in a prolonged verbal altercation leading up to the incident; Lee "poked" Jacinto during the altercation. According to the eyewitness, Contreras, Jacinto eventually apologized for his behavior and shook Lee's hand. Contreras testified that Lee would not let it go, however, and kept "lecturing" Jacinto about his behavior. According to Contreras, it was Lee's persistence that got Jacinto agitated again.

{¶ 136} When Jacinato and Lee engaged again, Lee told Contreras, who was trying to restrain Jacinto, "[l]et him go. I will fight him"; according to Contreras, Lee then assumed a "fighting stance." Contreras testified that he was done with the whole situation, and intentionally did not want to see anything; he only heard "scruffles." The hotel's surveillance camera did not capture the actual fight.

{¶ 137} On this record, I believe the evidence was sufficient to instruct the jury on self-defense. I would sustain the first assignment of error and remand the case for a new trial.