[Cite as *State v. Brown*, 2024-Ohio-1981.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,              :

                                    No. 113104

    v.                               :

RICHARD BROWN,                          :

    Defendant-Appellant.             :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 23, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-21-657521-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Nora Bryan, Assistant Prosecuting Attorney, *for appellee.*

Allison F. Hibbard, *for appellant.*

EILEEN T. GALLAGHER, P.J.:

{¶ 1} Defendant-appellant, Richard Brown ("Brown"), appeals from his convictions following a jury trial. He raises the following assignments of error for review:

1. The trial court erred in permitting testimony by Detective David Kappa as a fingerprint expert in violation of the defendant's right to a fair trial.

2. The trial court erred in permitting hearsay testimony by the SANE nurse.

3. Appellant's convictions are against the manifest weight of the evidence; therefore, his convictions are in violation of the Ohio state constitution and the Sixth and Fourteenth Amendments to the United States constitution.

{¶ 2} After careful review of the record and relevant case law, we affirm Brown's convictions and sentence.

## I. Procedural and Factual History

{¶ 3} On March 8, 2021, Brown was named in a four-count indictment, charging him with aggravated burglary in violation of R.C. 2911.11(A)(1) (Count 1); rape in violation of R.C. 2907.02(A)(2) (Count 2); felonious assault in violation of R.C. 2903.11(A)(2) (Count 3); and felonious assault in violation of R.C. 2903.11(A)(1) (Count 4). The indictment stemmed from allegations that Brown physically and sexually assaulted E.M. on January 4, 2021.

{¶ 4} The matter proceeded to a jury trial on May 31, 2023. At trial, the alleged victim, E.M., testified on behalf of the state. In January 2021, E.M. was living in an apartment complex located in Lakewood, Ohio. During this time period, E.M. frequently used crack cocaine and often allowed drug dealers into his home. At some point, E.M.'s roommate, "Diane," introduced E.M. to Brown, who went by the alias, "B." E.M. testified that Brown was his crack dealer for the "six to eight weeks leading up to January of 2021." (Tr. 194-195.)

{¶ 5} E.M. explained that he and Brown had a "falling out" after E.M. accumulated a debt in the amount of $1,500 for crack cocaine. (Tr. 196.) To fulfill the outstanding debt, Brown picked E.M. up at his apartment on January 3, 2021, and drove him to a nearby ATM in a white sports-utility vehicle ("SUV"). (Tr. 197.); *see also* state's exhibit No. 304. E.M. testified that he withdrew $600 from his bank account, but was unable to pay Brown back in full. A bank receipt reflects that the withdrawal was made at 2:29 a.m. on January 3, 2021. (State's exhibit No. 290.) E.M. attempted to make a second withdrawal from his bank account at 12:28 a.m. on January 4, 2021. (State's exhibit No. 291.) On this occasion, however, E.M. was unable to withdraw additional funds due to an insufficient balance.

{¶ 6} Later that morning, Brown entered E.M.'s apartment and initiated what E.M. described as a physical "beatdown." (Tr. 201.) E.M. summarized the altercation as follows:

> Well, it was, like, unrestrained blows were coming from everywhere. I was cut on the face. A knife was heated up on the stove and I got a burn on my leg. He beat me around the head and face with anything he could grab, like a mop, a broom until it cracked, and then he'd grab another one. He poured bleach on me and other chemicals, household chemicals because we were – it's a small apartment in the area by the kitchen, and then he grabbed a toilet bowl brush that was in my bathroom and inserted it into my rectum.

(Tr. 201-202.) E.M. identified Brown in court as the person that "assaulted [him] on January 4th of 2021." (Tr. 247.)

{¶ 7} When the altercation concluded, Brown left the scene and E.M. remained "curled up on the floor." (Tr. 203.) Once "lucid," E.M. called 911 and

waited at the apartment until the police arrived. (Tr. 204.) E.M. was subsequently transported to the hospital where he underwent an emergency surgery to repair a "perforated bowel." (Tr. 214.) E.M. was also treated for chemical burns and injuries to his head, face, shoulder, and leg.

{¶ 8} On cross-examination, E.M. confirmed that his apartment was a "revolving door" for drug dealers and users. (Tr. 221.) E.M. frequently permitted drug dealers to use his apartment to engage in sex and other activities in exchange for drugs. E.M. further conceded that he failed to identify Brown in a photo array that was presented to him during the police investigation.

{¶ 9} Patrol officer Justin Jameson ("Officer Jameson") of the city of Lakewood Police Department testified that he responded to E.M.'s apartment complex upon receiving a dispatch for a reported assault. When Officer Jameson arrived at the scene, he observed E.M. sitting on the front steps of the apartment building. E.M.'s eyes were swollen, and he had dried blood on his face. Officer Jameson also observed extensive injuries to E.M.'s body, including "tons of marks, scratches, bruises on his back and on his neck and pretty much everywhere on his body." (Tr. 258.) Officer Jameson subsequently spoke to E.M. in the hospital to gather additional information regarding the nature of the incident and the identity of the suspect. According to Officer Jameson, he learned that E.M. was assaulted by an individual E.M. knew by the alias "B." E.M. described his assailant as "a black male in his mid-30s about 6'4" in height and approximately 280 pounds." (Tr. 263.)

{¶ 10} Detective Gennaro Romanello ("Det. Romanello") of the city of Lakewood Police Department was assigned as the lead investigator in this case. In the course of his investigation, Det. Romanello spoke with E.M. in the hospital and learned that the alleged assailant was a drug dealer named "B" or "B Dude." (Tr. 487.) E.M. informed Det. Romanello that his assailant drove a "small white SUV," and was a "black male" approximately 6' 4", 280 pounds, with "short hair, [and] spotty beard." (Tr. 487 and 490.)

{¶ 11} Subsequently, Det. Romanello obtained E.M.'s consent to search his residence and his cell phone. The phone logs revealed that E.M. had unanswered, incoming calls from "B Dude" on January 3, 2021, at 2:05 a.m., 2:06 a.m., 2:07 a.m., 2:08 a.m., and 2:10 a.m. (State's exhibit No. 293.) E.M. later received incoming phone calls from "B Dude" on January 4, 2021, at 12:18 a.m., 9:17 a.m. and 10:18 a.m. (State's exhibit Nos. 296-297.)

{¶ 12} Det. Romanello testified that he used the information gathered from E.M.'s phone to search the city of Lakewood's surveillance system for video footage of the white SUV referenced by E.M. The surveillance footage established that the white SUV was present at the time E.M. withdrew funds from his bank at 2:29 a.m. on January 3, 2021. (State's exhibit No. 304.) The vehicle was also seen returning to E.M.'s apartment at approximately 10:18 a.m. on January 4, 2021, the same time a phone call was placed to E.M. by "B Dude." (State's exhibit Nos. 297 and 305.) The vehicle left the apartment complex approximately 24 minutes later. (State's exhibit No. 306.) Det. Romanello testified that the license plate associated with the

white SUV was run through the city of Lakewood's "license plate reader system, called Leonardo." (Tr. 501.) The system identified the vehicle as being a Ford Escape with a Tennessee license plate that was registered to a rental car company. On January 6, 2021, the white SUV was discovered at a residence located "three doors away" from where Brown was living at the time. (Tr. 523.) The vehicle was then towed to police headquarters where it was photographed and submitted for forensic testing.

{¶ 13} Once the white SUV was recovered, Det. Romanello learned that the vehicle was rented in the name of Delilah Shedrick ("Shedrick"). Det. Romanello testified that he met with Shedrick and gathered the following information:

> [Shedrick] remembered renting the car. She stated that, if I can recall correctly, her baby's father, Melvin Wind wanted her to rent it and that he lent it to somebody by the name of Styles that she didn't really know this individual. I had her describe him. That's all she could provide. She kept on asking [Melvin] * * * about the vehicle, where it's at, and he said don't worry about it. * * * I also showed her a photo of the defendant Richard Brown and she said that she did not recognize that person at all.

(Tr. 578-579.) Shedrick further stated that she was not familiar with anyone named "B."

{¶ 14} The search of E.M.'s home further corroborated E.M.'s version of events, and the police recovered various items, including a bleach bottle, a kitchen knife, a toilet brush, a broom handle, a large drinking glass, and a small drinking glass. The items were later submitted for fingerprint analysis and forensic testing. Based on the results of fingerprint analysis, Brown was identified as a potential

suspect. A blind administrator then presented E.M. with a photo array containing a photograph of Brown and five other males with similar characteristics and features. Det. Romanello confirmed that E.M. was unable to positively identify Brown in the photo array and, in fact, circled and initialed an individual that was randomly included in the lineup.

{¶ 15} Finally, Det. Romanello testified that he had an opportunity to speak with Brown following his arrest. During this recorded conversation, Brown admitted that he had previously borrowed the white Ford Escape from a friend and that he used the vehicle to drive E.M. to an ATM on January 3, 2021, to fulfill a "drug debt." (Tr. 537 and 599; state's exhibit No. 330.) Det. Romanello also obtained a buccal swab from Brown for DNA comparison.

{¶ 16} Detective Brian Berardi ("Det. Berardi") of the city of Lakewood Police Department testified that he assisted Det. Romanello in the search of E.M.'s residence, which was performed with E.M.'s consent. Upon entering the one-bedroom apartment, the police immediately observed blood spatter and blood prints in the kitchen and bathroom areas. Det. Berardi stated that there was "just blood everywhere." (Tr. 273.) The apartment also had "a strong odor of bleach" and a bottle of bleach was discovered on the floor with its cap off. (Tr. 272.) As mentioned, the police recovered several items believed to have been used during the assault, including a bent metal broom stick, a bent Swiffer handle, a kitchen knife, and a toilet cleaning brush. Det. Berardi testified that the toilet cleaning brush was covered in "blood and feces." (Tr. 272.) The police further discovered blood and

feces on the bathroom floor and a metal chair located near the apartment unit's entrance. All items recovered from the apartment were photographed and transported to the police station for forensic testing.

{¶ 17} Detective David Kappa ("Det. Kappa") of the city of Lakewood Police Department testified that he been employed as a detective for 15 years and has specialized training as it relates to analyzing latent fingerprints. He began his latent fingerprint training in 2019 and has completed more than 300 fingerprint comparisons in his career. Based on his training and experience, Det. Kappa was tendered as an expert in the field of fingerprint examination and analysis. Det. Kappa explained the methodology of fingerprint comparison as follows:

> The process or methodology used is called ACEV. And that stands for Analysis Comparison Evaluation and Verification. So in the analysis phase, I'm looking at the latent print to see what kind of detail it does have, can I tell if — what kind of fingerprint pattern it is, does it have enough ridge detail where I would be able to compare it to another print. That would be the analysis phase.
>
> Then in the comparison phase, I am looking between the latent print and a known print or a known exemplar and I'm looking at the two and I'm looking for likeness or differences between them. In the evaluation phase, I am coming to a conclusion. The conclusion would be is this a match, is it a non-match, or is there not enough detail within the latent print for me to come to a conclusion.
>
> Then once that's completed, it goes to the verification phase, where another independent latent print examiner uses the same ACE methodology and comes to their own conclusion, and this is also called peer review.

(Tr. 355-356.)

{¶ 18} In this case, Det. Kappa was asked to review certain latent prints that were lifted from a small drinking glass and a kitchen knife recovered from E.M.'s

residence. Det. Kappa testified that the latent prints discovered on these items were entered into the Automated Fingerprint Identification System ("AFIS") and "the AFIS hits returned to a Richard Brown." (Tr. 367.) Det. Kappa then verified the findings by using "magnifiers and physically looking and matching" the latent prints to Brown's known print. (Tr. 370, 376-377.) Det. Kappa's findings and conclusions were summarized in a written report. The state maintained that report was submitted to the defense in a timely fashion, stating:

> The report authored by Detective Kappa was provided to defense counsel about a year and a half ago. In his report, [Det. Kappa] references each of the prints, as well as the conclusions and when received * * * for him to testify to for those exhibits, they were turned over to counsel.

(Tr. 454.)

{¶ 19} Jane Pearson ("Nurse Pearson"), a sexual-assault nurse examiner ("SANE nurse") then employed by the Cleveland Clinic, testified that she performed a forensic examination on E.M. on January 5, 2021. As part of the examination, Nurse Pearson received a narrative statement from E.M. concerning the events that transpired on January 4, 2021. Nurse Pearson explained that a narrative statement guides her examination for medical diagnosis and treatment, stating:

> The narrative explains to us what occurred and where we should look for the evidence. As I said, each case is so different. We don't know if we're going to be doing a [sexual assault] kit that day, if we're going to be doing swabs, so we interview the patient to see where it would lead us.

(Tr. 321.)

{¶ 20} In this case, E.M. disclosed that "he was violently assaulted and beaten, he was hit in the head and face with a broom and mop and fist and feet, and then he was sexually assaulted. He said that a toilet bowl brush was inserted into his rectum." (Tr. 322.) E.M. further indicated that the assailant, who he referred to as "B," choked him, poured bleach on him, and burned him with a knife that was heated on the stove. (*Id.*) Based on the nature of E.M.'s disclosures, Nurse Pearson photographed E.M.'s injuries and collected swabs for forensic testing from his head, face, neck, ear, chest, back, and left thigh. E.M.'s narrative statement was incorporated into the SANE report, marked state's exhibit No. 349.

{¶ 21} Special agent Andrew Harasimchuk ("Harasimchuk") of the Ohio Bureau of Criminal Investigation ("BCI") testified that he participated in the processing of the white Ford Escape. Harasimchuk photographed the interior and exterior of the vehicle, collected items discovered inside the vehicle, and swabbed areas of the vehicle for forensic testing.

{¶ 22} Forensic scientist and DNA analyist, Lisa Moore ("Moore"), testified that she conducted DNA testing on several pieces of evidence, including (1) the toilet brush, (2) the bottle of bleach, (3) E.M.'s sexual assault kit, (4) a mask found inside the white SUV, and (5) swabs taken from the interior of the vehicle. The DNA profiles discovered on these items were then compared to a buccal swab taken from Brown. Moore testified that portions of the toilet brush and the bottle of bleach each contained E.M. and Brown's DNA. Brown's DNA was also discovered on the mask

and the swabs taken from the interior door handle and steering wheel of the white SUV.

{¶ 23} At the close of the state's case, outside of the presence of the jury, defense counsel moved for acquittal pursuant to Crim.R. 29. The trial court denied the motion.

{¶ 24} On behalf of the defense, Shedrick confirmed that she rented a "white SUV" in late 2020. (Tr. 613.) Shedrick testified that the father of her child had permitted an individual named "Styles" to drive the vehicle. Shedrick did not know Styles's real name but described him as being in his "late 30s early 40s." (Tr. 616.) Consistent with her statement to Det. Romanello, Shedrick reiterated that she did not know anyone named "B" and did not recognize Brown from the photograph shown to her during her police interview.

{¶ 25} At the conclusion of trial, Brown was found guilty of all charges and was sentenced to an aggregate, indefinite prison term of 14 to 18.5 years in prison. (Tr. 726.)

{¶ 26} Brown now appeals from his convictions.

## II. Law and Analysis

### A. Expert Testimony

{¶ 27} In the first assignment of error, Brown argues the trial court deprived him of his constitutional right to a fair trial by permitting Det. Kappa to testify as a fingerprint expert. Brown contends that "the fingerprint testimony in the instant matter is problematic and should not have been admissible for numerous reasons."

{¶ 28} Generally, decisions regarding the admissibility of evidence are within a trial court's discretion and will be upheld unless an abuse of discretion is demonstrated. *State v. Haines*, 112 Ohio St.3d 393, 2006-Ohio-6711, 860 N.E.2d 91, ¶ 50. A court abuses its discretion when it exercises its judgment in an unwarranted way with respect to a matter over which it has discretionary authority. *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35. An abuse of discretion may be found where a trial court "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Thomas v. Cleveland*, 176 Ohio App.3d 401, 2008-Ohio-1720, 892 N.E.2d 454, ¶ 15 (8th Dist.). An abuse of discretion also implies a decision that is unreasonable, arbitrary, or unconscionable. *State ex rel. DiFranco v. S. Euclid*, 144 Ohio St.3d 571, 2015-Ohio-4915, 45 N.E.3d 987, ¶ 13. When applying the abuse-of-discretion standard, a reviewing court may not substitute its judgment for that of the trial court. *Vannucci v. Schneider*, 2018-Ohio-1294, 110 N.E.3d 716, ¶ 22 (8th Dist.).

{¶ 29} Brown first argues the state failed to comply with the requirements of Crim.R. 16(K) by (1) failing to disclose Det. Kappa's expert report within 21 days of trial, and (2) offering expert testimony that "far exceeded that of the original report that was initially provided." Thus, Brown asserts that "the trial court erred in permitting Det. Kappa to testify to descriptions of matching characteristics, the process of making the comparison, and the various findings and conclusions contained within Defense exhibit A."

{¶ 30} Crim.R. 16 governs discovery in criminal cases. Its purpose is "to provide all parties in a criminal case with the information necessary for a full and fair adjudication of the facts, to protect the integrity of the justice system and the rights of defendants, and to protect the well-being of witnesses, victims, and society at large." Crim.R. 16(A). Discovery concerning expert-witness reports is governed by Crim.R. 16(K). That provision reads:

> An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.

{¶ 31} The Supreme Court of Ohio has made clear that under Crim.R. 16(K) where an expert witness formulates opinions that the state intends to offer into evidence, those opinions must be set forth in the expert's report giving the defendant formal notice and the opportunity to seek other expert-opinion testimony on the issue. *State v. Boaston*, 160 Ohio St.3d 46, 2020-Ohio-1061, 153 N.E.3d 44, ¶ 57. The Ohio Supreme Court further explained that the exclusion provision is mandatory, stating as follows:

> The plain language of Crim.R. 16(K) expressly provides the consequence for failing to disclose an expert's report as required: "Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial." Crim.R. 16(L)(1) implicitly acknowledges this remedy: "The trial court may make orders regulating discovery not inconsistent with this rule." And while Crim.R. 16(K) confers some measure of discretion on trial judges, it is limited to

> modifying the 21-day requirement "for good cause shown, which does not prejudice any other party."

*Id.* at ¶ 55.

{¶ 32} In this case, the record reflects that Det. Kappa's expert report, dated January 13, 2021, was delivered to defense counsel on January 18, 2023 — well before the trial commenced in this matter. The report set forth (1) the items received for analysis; (2) the process used to reveal latent prints on the submitted items; (3) Det. Kappa's findings regarding the sufficiency of the "ridge detail" on each latent print; (4) Det. Kappa's use of AFIS; (5) the identification of Brown in the "candidate list" produced by the local and state databases; (6) the results of Det. Kappa's "one to one comparison" of the latent prints and Brown's known prints; and (7) Det. Kappa's verification of the findings made by his colleague, Detective Jim Motylewski ("Det. Motylewski"), who analyzed the latent prints discovered on the kitchen knife recovered from E.M.'s residence. Det. Kappa further provided a summary of his qualifications and specialized training in the field of fingerprint analysis.

{¶ 33} Having reviewed the expert report and the substance of Det. Kappa's testimony in their entireties, we cannot find that the state violated Crim.R. 16(K). Det. Kappa's testimony was consistent with the results contained in the disclosed expert report. In addition, the record reflects that defense counsel engaged in a thorough cross-examination of Det. Kappa regarding his training, experience, methodology, and scientific conclusions. Accordingly, we are unable to conclude that Brown was subjected to unfair surprise that materially prejudiced the defense.

{¶ 34} Alternatively, Brown argues the trial court abused its discretion by qualifying Det. Kappa as an expert in the field of fingerprint analysis and comparison. Brown contends that Det. Kappa had insufficient qualifications, training, and experience, and lacked firsthand knowledge of findings "that he himself had not made."

{¶ 35} "Evid.R. 702 governs the admissibility of expert testimony." *State v. Ferricci*, 8th Dist. Cuyahoga No. 110208, 2022-Ohio-1393, ¶ 65. Under Evid.R. 702, a witness may offer testimony as an expert if

> (1) the witness' testimony relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons; (2) the witness is qualified as an expert by specialized knowledge, skill, experience, training or education regarding the subject matter of the testimony and (3) the witness' testimony is based on reliable scientific, technical or other specialized information.

*State v. Jacinto*, 2020-Ohio-3722, 155 N.E.3d 1056, ¶ 83 (8th Dist.). Evid.R. 702 provides for expert testimony because "the jury is unable to draw proper inferences from the facts in certain situations." *Ferricci* at ¶ 66, quoting *State v. Campbell*, 1st Dist. Hamilton Nos. C-010567 and C-010596, 2002-Ohio-1143, ¶ 3. "The purpose of expert testimony is to assist the trier of fact in determining a fact, issue, or understanding the evidence." *Id*.

{¶ 36} In this case, there is no dispute that "the collection of fingerprints and the comparison of those prints with known samples is a matter beyond the knowledge or experience possessed by a lay person." *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶ 118, citing *State v. Hartman*, 93 Ohio St.3d

274, 284, 754 N.E.2d 1150 (2001) ("expert testimony was necessary to make fingerprint comparisons").

{¶ 37} As to the second requirement, Det. Kappa described the specialized training he has received in fingerprint analysis. Consistent with the information incorporated into his report, Det. Kappa outlined the courses and examinations he has completed since his training in the field of fingerprint examination began in January 2019. Det. Kappa further testified to his vast experience with both collecting and analyzing fingerprints as a detective in the city of Lakewood, stating that he has completed "over 300" fingerprint comparisons since 2019. Although Det. Kappa confirmed that he had not previously testified as a fingerprint expert in his career, he carefully explained the significance of his training and the scientific process supporting his opinions in this matter.

{¶ 38} Under these circumstances, we find the trial court did not abuse its discretion by concluding that Det. Kappa had met Evid.R. 702(B)'s requirement of "specialized knowledge, skill, experience, training, or education" regarding fingerprint evidence. Contrary to Brown's assertion on appeal, a witness "need not have complete knowledge of the field in question" to qualify as an expert; it is sufficient that the knowledge Det. Kappa possessed about fingerprint analysis would "aid the trier of fact in performing its fact-finding function." *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 148. Indeed, a witness can have expert status without having completed special education or receiving a certification. *Id.*

{¶ 39} Finally, to be admissible, Det. Kappa's testimony had to be "based on reliable scientific, technical, or other specialized information." Evid.R. 702(C). To this point, the Ohio Supreme Court has routinely observed that "'the reliability of fingerprint evidence is well established.'" *Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, at ¶ 122, quoting *State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 93; *see also Davis* at ¶ 140. Brown has presented no rational basis to categorically reject fingerprint evidence as a permissible subject of expert testimony. Accordingly, we find the third prong of Evid.R. 702 was satisfied.

{¶ 40} Based on the foregoing, we find the trial court did not abuse its discretion by permitting Det. Kappa to testify as a fingerprint expert. Moreover, to the extent Brown suggests that Det. Kappa improperly testified as to findings made by his colleague, the record reflects that Det. Kappa personally verified Det. Motylewski's analysis of the latent print discovered on the kitchen knife and rendered the following conclusion:

> Det. Motylewski conducted a one-to-one comparison between (P1) and the right palm print card bearing the name Richard Brown * * * and a match was made to (P1). I verified Det. Motylewski's findings this same date.

{¶ 41} Under these circumstances, we find Det. Kappa's testimony was limited to his own observations, including the specific comparisons he completed and his verification of the results reached by his colleague. As explained by Det. Kappa during his direct examination, the verification process is a necessary step in the scientific analysis of latent fingerprints.

{¶ 42} The first assignment of error is overruled.

## B. Hearsay Evidence

{¶ 43} In the second assignment of error, Brown argues the trial court committed reversible error "by permitting hearsay testimony by the SANE nurse." Brown contends that E.M.'s statements to Nurse Pearson constituted inadmissible hearsay because E.M. "had already been operated on and seen by multiple doctors" at the time the narrative statement was provided. Thus, Brown maintains that "the statements made by E.M. were no longer being made for the purposes of medical diagnosis or treatment, rather they were simply being made to describe what happened to him."

{¶ 44} As previously stated, we review a trial court's decision regarding the admissibility of evidence for an abuse of discretion. *State v. Apanovitch*, 33 Ohio St.3d 19, 25, 514 N.E.2d 394 (1987).

{¶ 45} Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Pursuant to Evid.R. 802, hearsay is inadmissible unless it falls within an exception provided by the rules of evidence. Should hearsay statements be admitted improperly, however, such error does not necessarily require reversal of the outcome of the trial if it was harmless. *See Arizona v. Fulminante*, 499 U.S. 279, 306-309, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

{¶ 46} Evid.R. 803(4) allows, as an exception to the hearsay rule, the admission of "statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." "When examining the admissibility of hearsay statements under Evid.R. 803(4), the primary inquiry is whether the statements were made for the purposes of medical diagnosis or treatment, as opposed to some other purpose." *Fields v. CSX Transp., Inc.*, 197 Ohio App.3d 561, 2011-Ohio-6761, 968 N.E.2d 70, ¶ 17 (8th Dist.).

{¶ 47} In cases of sexual assault, "courts have consistently found that a description of the encounter and identification of the perpetrator are within the scope of statements for medical treatment and diagnosis." *In re D.L.*, 8th Dist. Cuyahoga No. 84643, 2005-Ohio-2320, ¶ 21, citing *State v. Stahl*, 9th Dist. Summit No. 22261, 2005-Ohio-1137, ¶ 15. However, not every statement made by a declarant in aid of treatment is admissible under the rule: "The exception is limited to those statements made by the patient which are reasonably pertinent to an accurate diagnosis and should not be a conduit through which matters of no medical significance would be admitted." Staff Note to Evid.R. 803(4); *State v. Echols*, 8th Dist. Cuyahoga No. 102504, 2015-Ohio-5138, ¶ 28.

{¶ 48} In this case, Nurse Pearson testified that she obtained a narrative history from E.M. to "explain to us what occurred and where we should look for evidence." (Tr. 321.) She explained that the narrative statement guides her "exam

for medical diagnosis or treatment" and permits her to adequately assess the safety and needs of the patient. (Tr. 321.) With that stated, we recognize that E.M.'s sexual-assault examination did not occur until January 5, 2021 — one day after he received emergency medical treatment from multiple doctors and was diagnosed with a perforated rectum. (State's exhibit No. 347.) Nevertheless, to the extent Brown argues the narrative statement was not made for the primary purposes of medical diagnosis and treatment because E.M. had already been treated for his injuries at the time the forensic examination occurred, we find such error, if any, was harmless.

{¶ 49} "'The harmless error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence.'" *State v. Keith*, 8th Dist. Cuyahoga No. 69267, 1997 Ohio App. LEXIS 914, * 25 (Mar. 13, 1997), quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). Crim.R. 52(A) defines the harmless-error doctrine in criminal cases and provides that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Under Crim.R. 52, in order to prejudice a defendant's substantial rights, the error "'must have affected the outcome of the [trial] court proceedings.'" *State v. Fisher*, 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, ¶ 7, quoting *United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

{¶ 50} In determining whether the admission of evidence constitutes harmless error under Crim.R. 52(A), courts apply the following three-part test:

> "First, it must be determined whether the defendant was prejudiced by the error, i.e., whether the error had an impact on the verdict. * * * Second, it must be determined whether the error was not harmless beyond a reasonable doubt. * * * Lastly, once the prejudicial evidence is excised, the remaining evidence is weighed to determine whether it establishes the defendant's guilt beyond a reasonable doubt. * * *"

*Boaston*, 160 Ohio St.3d 46, 2020-Ohio-1061, 153 N.E.3d 44, at ¶ 63, quoting *State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 37, citing *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 25, 27-29, and 33.

{¶ 51} After applying the harmless-error analysis established in *Morris*, as articulated in *Boaston* and *Harris*, we conclude that the admission of the narrative statement did not affect the substantial rights of Brown. As discussed in further detail below, the remaining evidence adduced by the state established his guilt beyond any reasonable doubt. Here, the state presented ample evidence establishing Brown's guilt, including E.M.'s identification testimony, Brown's financial motive, the surveillance images and phone logs placing Brown at the scene, and the presence of Brown's fingerprints and DNA on items used to facilitate the criminal offenses. Moreover, E.M. testified at trial[1] and his description of the incident was largely cumulative to the information set forth in the narrative portion of the SANE report. *See State v. Williams*, 38 Ohio St.3d 346, 350, 528 N.E.2d 910 (1988) (finding the admission of hearsay that was cumulative to other admitted

---

[1] We note that Brown's brief arguments relating to the Confrontation Clause are inapplicable because E.M. testified at trial. *State v. Keenan*, 81 Ohio St.3d 133, 142, 689 N.E.2d 929 (1998) ("[T]he admission of hearsay does not violate the Confrontation Clause if the declarant testifies at trial."). *Accord Crawford v. Washington*, 541 U.S. 36, 59, 124 S.Ct. 1354, 158 L.Ed. 2d 177, fn. 9 (2004).

evidence constitutes harmless error). Accordingly, even if the trial court should have excluded the narrative report, we are not convinced that it impacted the jury's verdict.

{¶ 52} The second assignment of error is overruled.

## C. Manifest Weight of the Evidence

{¶ 53} In the third assignment of error, Brown argues his convictions are against the manifest weight of the evidence.

{¶ 54} When reviewing a manifest weight challenge, an appellate court, "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Virostek*, 8th Dist. Cuyahoga No. 110592, 2022-Ohio-1397, ¶ 54, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A reversal on the basis that a verdict is against the manifest weight of the evidence is granted "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *Martin* at 175.

{¶ 55} As this court has previously stated:

The criminal manifest weight of-the-evidence standard addresses the evidence's effect of inducing belief. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541 (1997). Under the manifest weight-of-the-evidence standard, a reviewing court must ask the following question: whose evidence is more persuasive — the state's or the defendant's? *Wilson* at *id.* Although there may be legally sufficient evidence to

support a judgment, it may nevertheless be against the manifest weight of the evidence. *Thompkins* at 387; *State v. Johnson*, 88 Ohio St.3d 95, 723 N.E.2d 1054 (2000).

When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. *Wilson* at *id.*, quoting *Thompkins* at *id.*

*State v. Williams*, 8th Dist. Cuyahoga No. 108275, 2020-Ohio-269, ¶ 86-87.

{¶ 56} As stated, Brown was convicted of aggravated burglary in violation of R.C. 2911.11(A)(1) (Count 1); rape in violation of R.C. 2907.02(A)(2) (Count 2); felonious assault in violation of R.C. 2903.11(A)(2) (Count 3); and felonious assault in violation of R.C. 2903.11(A)(1) (Count 4). The trial court merged Counts 1 and 4, and the state elected to pursue sentencing on the aggravated burglary conviction. Accordingly, we limit our review to Counts 1, 2, and 3. *See State v. Franks*, 8th Dist. Cuyahoga No. 103682, 2016-Ohio-5241, ¶ 18 (recognizing that merged counts are not convictions).

{¶ 57} On appeal, Brown does not challenge the sufficiency of the evidence supporting the elements of each offense. Rather, Brown broadly argues the evidence weighs heavily against his convictions because (1) the alleged victim was unable to identify Brown as the assailant during the police investigation, (2) there was no testimony that Brown went by the name "B," (3) E.M. was smoking crack cocaine at the time of the incident, (4) the police failed to explore other suspects, (5) the fingerprint evidence was unreliable, and (6) the DNA evidence was "unpersuasive as to Brown's guilt."

{¶ 58} Having reviewed the entire record, we cannot say the jury clearly lost its way and created such a manifest miscarriage of justice that Brown's convictions must be reversed and a new trial ordered. In this case, E.M. thoroughly described the circumstances that led to his assault on January 4, 2021. He discussed his substance-abuse issues and the substantial debt he accumulated with Brown, whom he knew as "B" or "B Dude." E.M. testified about Brown's efforts to collect money from him on January 3, 2021, and January 4, 2021, and the actions Brown took against him when he was unable to pay Brown back in full. According to E.M., Brown entered E.M.'s apartment and commenced a physical and sexual assault that caused multiple injuries and required E.M. to undergo emergency surgery. Specifically, E.M. testified that Brown repeatedly struck him with several items located inside the apartment, including a mop and a broom. After ordering E.M. to take his clothes off, Brown poured bleach on E.M.'s body and used a hot kitchen knife to burn his leg. Most abhorrently, Brown then retrieved a toilet brush from the bathroom and forcefully used it to penetrate E.M.'s rectum. E.M.'s testimony was corroborated by the photographs of his injuries and the state of his apartment when the responding officers searched the scene for evidence.

{¶ 59} Although E.M. was unable to successfully identify Brown from the photo array, he confirmed that Brown was his drug dealer at the time of the incident. He further identified Brown in court as the person that physically and sexually assaulted him on January 4, 2021. (Tr. 193, 196, 200-201, and 247.) *See State v. Muhammad*, 8th Dist. Cuyahoga No. 104111, 2016-Ohio-8322, ¶ 23 ("[T]here is no

requirement that a defendant be specifically identified as the perpetrator of a crime * * * during a lineup or photo array to uphold the defendant's conviction."), citing *State v. Littlejohn*, 8th Dist. Cuyahoga No. 101549, 2015-Ohio-875, ¶ 37; *State v. Brown*, 8th Dist. Cuyahoga No. 98881, 2013-Ohio-2690, ¶ 30; *State v. Collins*, 8th Dist. Cuyahoga No. 98350, 2013-Ohio-488, ¶ 19, citing *State v. Lawwill*, 12th Dist. Butler No. CA2007-01-014, 2008-Ohio-3592, ¶ 11. E.M. was cross-examined about his recollection of the incident, the possible memory issues associated with his drug use, and the significance of his inability to identify Brown in the photo lineup. Thus, the trier of fact was presented with all pertinent facts and was in the best position to weigh the credibility of E.M.'s identification testimony.

{¶ 60} In an effort to corroborate E.M.'s timeline, the state introduced cell phone call logs and surveillance images that established "B Dude's" communications with E.M. and the movements of the white SUV on the day in question. The surveillance footage established that the white SUV was at E.M.'s apartment complex for approximately 24 minutes on the day E.M. called 911 for emergency assistance. In turn, Brown conceded during his initial interview with Det. Romanello that he was E.M.'s drug dealer and had previously borrowed the white SUV from a friend.

{¶ 61} Finally, the state presented substantial physical and forensic evidence linking Brown to the scene. Not only did the DNA and fingerprint evidence place Brown inside E.M.'s apartment and the white SUV, but the evidence also established to a degree of scientific certainty that Brown possessed the specific items used to

facilitate the physical and sexual assault, including the kitchen knife used to burn E.M.'s leg, the bottle of bleach poured on E.M.'s body, and the toilet brush used during the commission of the rape offense.

{¶ 62} Viewing the foregoing evidence collectively, we cannot say Brown's convictions were against the manifest weight of the evidence. The third assignment of error is overruled.

{¶ 63} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

EILEEN T. GALLAGHER, PRESIDING JUDGE

SEAN C. GALLAGHER, J., and
FRANK DANIEL CELEBREZZE, III, J., CONCUR